**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE,** | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | **No. 16-5854** |
| | ) | **Death Penalty Case** |
| **CAROLYN JORDAN**, Warden, | ) | |
| | ) | |
| Respondent-Appellee. | ) | |

On Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville

**APPLICATION FOR CERTIFICATE OF APPEALABILITY**

Stephen A. Ferrell, BPR# 025170
FEDERAL DEFENDER SERVICES
OF EASTERN TENNESSEE, INC.
Asst. Federal Community Defender
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
(865) 637-7979

October 28, 2016

*Attorney for Petitioner/Appellant Pike*

# TABLE OF CONTENTS

I. STATEMENT OF THE CASE .......... 2

II. STATEMENT OF FACTS .......... 4

III. PIKE IS ABLE TO MEET THE STANDARDS FOR THIS COURT TO GRANT CERTIFICATES OF APPEALABILITY. .......... 14

IV. ARGUMENTS IN SUPPORT OF A CERTIFICATE OF APPEALABILITY .......... 17

A. Jurists of reason could find that the Pike's trial counsel were constitutionally ineffective during the penalty phase of her capital trial. (Claims One and Two, Petition for Writ of Habeas Corpus) .......... 17

1. Because the state court's decisions on Ineffective Assistance of Counsel were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, the District Court was permitted to conduct a federal evidentiary hearing on this issue. .......... 19

2. In order to assess the reasonableness of the state court's findings of fact, the district Court was required to engage in a close review of the record to determine if the state court factual determinations are reasonable in light of the state court record as a whole. .......... 21

3. Reasonable jurists could find that trial counsel's last-minute decision to abandon the mitigation case constituted substandard performance and the state courts' conclusion that counsel's performance in the penalty phase was not deficient was unreasonable. .......... 25

4. The Tennessee courts' decision that Pike was not prejudiced by counsel's failure to present the mitigation evidence Dr. McCoy had gathered is unreasonable. .......... 48

5. Counsel were ineffective due their failure to discover compelling mitigating evidence. .......... 59

6. Conclusion .......... 73

B. Jurists of reason could find that Pike's trial counsel were constitutionally ineffective during the guilt phase of her capital trial

for failing to investigate and present evidence that she did not form the required *mens rea* to be found guilty of first degree murder......... 74

1. Because counsel failed to effectively challenge the State's case for premeditation by effectively using the necessary experts supported by lay-witness testimony, counsel's performance fell below constitutional standards. ........................................................................ 75

2. Evidence presented in post-conviction demonstrates that Petitioner Pike was prejudiced by her counsel's failure to ensure that their experts' opinions were adequately supported and that the proper experts were presented. ........................................................ 79

C. The death sentence in this case violates Christa Pike's rights to a fair jury and due process of law because the trial court dismissed for cause a juror who was qualified to serve and trial counsel were ineffective for failing to object. ........................................................ 83

D. Jurists of reason could find that the Eighth Amendment forbids the execution of adolescents suffering from serious mental illness or brain defect.......................................................................................... 90

V. CONCLUSION ......................................................................................... 98

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE,** | ) | |
| | ) | |
| Petitioner-Appellant | ) | |
| | ) | |
| v. | ) | **No. 16-5854** |
| | ) | **DEATH PENALTY CASE** |
| **CAROLYN JORDAN, Warden,** | ) | |
| | ) | |
| Respondent-Appellee | ) | |

---

## APPLICATION FOR CERTIFICATE OF APPEALABILITY

---

Now comes Petitioner-Appellant, Christa Pike and moves this Court to grant her a certificate of appealability on the claims for relief raised in her Petition for Writ of Habeas Corpus. (R.19)

The district court not only rejected these claims, but also denied Petitioner a certificate of appealability (COA) as to each. Because jurists of reason could disagree with the district court's resolution of these claims and/or the claims deserve further review, Petitioner now asks this Court to issue a COA as to each claim and to set a briefing schedule. Petitioner requests a COA as to each issue raised in her habeas petition below, but develops her arguments for a COA on each of

the four issues listed below because they are particularly compelling and worthy of review:

A. Ineffective Assistance of Counsel in the penalty phase;

B. Ineffective Assistance of Counsel in the trial phase;

C. Ineffective Assistance of Counsel in voir dire leading to the unconstitutional excusal of a qualified juror; and

D. The Eighth Amendment prohibits the execution of an 18 year-old.

## I. STATEMENT OF THE CASE

On April 12, 1995, Christa Pike, Shadolla Peterson and Tadaryl Shipp were indicted for the premeditated murder and conspiracy to commit the premeditated murder of Colleen Slemmer. (R.7-1, T. Tech. Rec., PageID# 34).[1] Pike was the first to be tried. She was convicted of both charges and sentenced to death for the murder and to a consecutive 25 years for conspiracy. (R.7-3, T. Tech. Rec., PageID# 430-31, 445-46). Pike's convictions and sentences were affirmed on appeal. *State v. Pike*, 978 S.W.2d 904 (Tenn. 1998), *cert. denied*, 526 U.S. 1147 (1999).

---

[1] Citations to the record contain the district court record number (R.__), and the PageID#.

Next, Pike filed for post-conviction relief challenging both her conviction and sentence. (R.9-1, PC Tech. Rec., PageID# 3781-92). Evidentiary hearings were conducted in the post-conviction court in January 2007, July 2007 and April 2008. The state post-conviction court denied relief. (R.9-5, PC Tech. Rec., PageID# 4387-4489). The Tennessee Court of Criminal Appeals affirmed the post-conviction court's denial of relief. *Pike v. State*, No. E2009-00016-CCA-R3-PD, 2011 WL 1544207 (Tenn. Crim. App. Apr. 25, 2011), *perm. appeal denied* (Nov.15, 2011).

Having exhausted her state court remedies, Pike filed her Petition for Writ of Habeas Corpus in the District Court for the Eastern District of Tennessee. (R.19, PageID# 9595-9717). The Respondent filed for Summary Judgment. (R.42, Motion for Summary Judgment; R.43, Memorandum in Support). Pike filed a Motion for Partial Summary Judgment as well as a Motion for Evidentiary Hearing. (R.45, Motion for Partial Summary Judgment; R.46, Memorandum in Support; and R.51, Petitioner's Response in Opposition to Respondent's Motion for Summary Judgment and Petitioner's Motion for Evidentiary Hearing). The district court held a hearing on May 26-27, 2015, but reserved

ruling on the consideration of the evidence presented at that hearing until it determined whether Petitioner had cleared the limitation to receiving new evidence under 28 U.S.C. § 2254(d). (Order, R.83, PageID# 12978).

On March 11, 2016, the district court granted the Warden's Motion for Summary Judgment on all claims. (Memorandum Opinion R.93; Judgment Order, R.94). The court also found that Petitioner had not met the burden to allow consideration of the evidence presented at the evidentiary hearing. (Memorandum Opinion, R. 93, PageID# 13314-15). Finally, the court denied the issuance of any Certificates of Appealability. (Memorandum Opinion, R.93, PageID# 13336-57; Memorandum Opinion, R.96, PageID# 13371).

Petitioner Pike filed her Notice of Appeal on June 15, 2016. (R.97). She is now before this Court seeking Certificates of Appealability.

## II. STATEMENT OF FACTS

Eighteen-year-old Christa Pike, seventeen-year-old Tadaryl Shipp and nineteen-year-old Shadolla Peterson were all indicted for the murder of Colleen Slemmer on January 12, 1995. Ms. Pike had given a

detailed statement admitting her involvement in this murder. (R.8-15, PageID# 3375-3420).

The testimony presented at Pike's capital trial showed that Christa Pike, co-defendants Tadaryl Shipp and Shadolla Peterson, and the victim, Colleen Slemmer, were all students at Job Corps, a residential program designed to help troubled teens gain job skills. Pike was romantically involved with co-defendant Shipp, when she began to suspect that Slemmer was interested in him and a rivalry developed. (R.8-8, PageID# 2761). Pike and her co-defendants enticed Slemmer to join them in a secluded area near Job Corps and then attacked her. Slemmer's skull was fractured by a large piece of asphalt, her throat was slit multiple times, and a pentagram was carved in her chest. (R.8-2, PageID# 2232-33, 2236; R.8-3, PageID# 2288-91, 2321). The prosecution generally established its case through the testimony of the medical examiner and admission of Pike's confession.

The lead attorney representing Pike at trial was William Talman. Talman had recently been under investigation for fraudulently billing the Indigent Defense Fund for working numerically-impossible amounts

of hours.[2] He was accused of overbilling the Fund after sometimes billing for more than 24 hours of legal services in a single day. An audit uncovered this numeric impossibility and a highly publicized investigation into the over-billing scandal was launched. He repaid $67,027 to the Fund and eventually settled with the Board of Professional Responsibility by pleading guilty to several ethical charges. However, the ethical charges were pending during the representation of Pike. The Tennessee Supreme Court stripped Talman of his law license for eleven months and twenty-nine days. This sanction was suspended upon Talman's compliance with numerous conditions, including that his practice be monitored by a court-appointed representative. (R.12-3, PageID# 8471-72). Talman was never officially released of criminal liability where he was facing prosecution for theft over $60,000, a Class B felony with a minimum sentencing range of eight to twelve years.

---

[2] *See* correspondence between Randy Nichols, Attorney General for the 6th Judicial District, who prosecuted Pike's case, and the District Attorney for the 20th Judicial District, referencing TBI's investigation into Talman. The correspondence indicates involvement by the TBI, the Tennessee Administrative Office of the Courts, the State Attorney General's Office, the Comptroller of the Treasury, and the Tennessee District Attorneys General Conference. (R.11-2, PageID# 7256-77).

At the time of his appointment, Talman had never handled a death penalty case. (R.9-19, PageID# 5909). His co-counsel, Julie (Martin) Rice was appointed just 55 days before trial started. The trial court only agreed to her appointment as long as she would not to seek a continuance to prepare for trial. (R.11-2, PageID# 7325-26). She had been licensed for approximately three-and-a half years at the time of Pike's trial. (R.9-17, PageID# 5677-78). She had never handled a murder case or any prosecution more serious than a Class B felony. (R.9-17, PageID# 5679-81).

The defense theory at trial was that Pike was guilty of reckless homicide, not first-degree murder. The defense offered the testimony of clinical psychologist, Dr. Eric Engum, to testify about Pike's mental state "along [the] line[s]" of diminished capacity. (R.8-7, PageID# 2708-10). Dr. Engum told the jury Pike suffers from borderline personality disorder. He reached this conclusion based on meetings with Pike and her performance on psychological tests. (R.8-7, PageID# 2732-35, 2739). Dr. Engum never testified about Pike's social history to explain the possible origins of this disorder.

Dr. Engum told the jury Pike was not legally insane but that she did not act with deliberation or premeditation. Instead, she basically "went out of control." (R.8-7, PageID# 2753). On cross-examination, Dr. Engum acknowledged his opinion was based entirely upon Pike's self-report of the homicide and his testing. (R.8-8, PageID# 2764). He also conceded she could be aggressive and impulsive. (*Id.* at 2771-72).

The defense also offered the testimony of William Bernet, Medical Director of the Psychiatric Hospital at Vanderbilt University, an expert in analyzing satanic rituals. He testified that due to the "mutilation of [the] body," there are "satanic elements in this crime." (*Id.*at PageID# 2841). But he did not think that the "whole picture fits the pattern of a satanic ceremony, or a satanic sacrifice, or a planned satanic sacrifice." (*Id.* at 2842). Despite this opinion, he added to the jury's consideration of a possible satanic angle by discussing a copy of *The Satanic Bible* by Anton Lavey which was entered into evidence. (R.8-8, PageID# 2839; R.8-6, PageID# 2636). When defense counsel asked Dr. Bernet if he had an opinion as to whether the crime was premeditated, Dr. Bernet stated he had no such opinion because he never examined Pike and was never asked to form such an opinion. (R.8-9, PageID# 2880-82).

At the conclusion of Dr. Bernet's direct examination, the trial court admonished defense counsel for failing to disclose Dr. Bernet's report as Tenn. R. Crim. P. 26.2 required. (R.8-9, PageID# 2884). Dr. Bernet testified that in discussing the matter with Talman, he "came to understand that it was not necessary . . . to do a report." (*Id.*). The trial court explained to defense counsel that he was not in compliance with the rule and defense counsel apologized. (*Id.*).

In closing argument, defense counsel argued the testimony of Drs. Engum and Bernet established Pike was guilty of reckless homicide. (*Id.* at 2956). The jury disagreed and convicted Pike of first degree, premeditated murder.

Prior to and during the trial, forensic psychologist, Dr. Diana McCoy acted as the defense mitigation specialist and investigator. The substance of Dr. McCoy's work was contained in three volumes consisting of a 60-page Social History, numerous records she had collected and her memoranda of all of the interviews she had conducted with Pike, her family, friends, as well as some juvenile court employees who had worked with Pike. Talman's plan was to present the case for a

life sentence through the testimony of Dr. McCoy. (*See* R.9-20, PageID# 5986-87; R.9-25, PageID# 6388, 6414).

At the close of the guilt phase of the trial, after the jury had returned a conviction of murder in the first degree, the trial court called an *in camera* meeting with both parties. Defense counsel failed to request that this meeting be recorded, and because it took place out of the presence of the court reporter, there is no definitive record of what was said. However, during this *in camera* meeting, Talman provided the prosecutor with Dr. McCoy's three-volume Mitigation Materials and Social History, possibly by court order.[3] (R.8-10, PageID# 3030). However, the record reflects no such order, no objection from the defense nor any request that the disclosure be limited.

After the meeting, once again in court and on the record, the prosecutor expressed agitation at having received voluminous materials pertinent to Dr. McCoy's testimony immediately before she was to take the stand. (*Id.* at 3030-34). The trial court then continued the start of

[3] The Tennessee Court of Criminal Appeals determined that the trial court must have ordered Talman to turn over the materials. *Pike*, 2011 WL 1544207, at *55.

the penalty phase until the following morning to allow the prosecutor time to review Dr. McCoy's Mitigation Materials and Social History. (R.8-10, PageID# 3030). Neither the prosecutor nor the trial court could locate Dr. McCoy's report or opinion within the materials and Talman was unsure as to whether Dr. McCoy had prepared one.[4] (*Id.* at PageID# 3033-34).

In post-conviction, Dr. McCoy testified that Talman contacted her that afternoon in a panic. She testified that he told her he had lied to the trial court and prosecutor by saying he had only received the materials himself the prior evening, March 28, 1996. (R.9-25, PageID# 6413). Dr. McCoy had given the three volumes of work to Talman on Sunday, March 24, one week before jury selection began. (*Id.*). Talman

[4] If the attorneys and the court were unsure about whether Dr. McCoy's materials contained opinion testimony to be offered in court, it is unclear under what theory the trial court would have ordered disclosure. Tennessee Rules of Evidence Rule 705, only contemplates the disclosure of reports and opinions. ("The expert may testify in terms of opinion or inference and give reasons without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.") (adopted effective Jan. 1, 1990). Since the conference with counsel was not recorded, the basis for the court's ruling (if any) is unknown.

had told her that he planned to provide any discoverable materials to the State only at the last possible instant. (R.9-24, PageID# 6346-47). He asked Dr. McCoy to corroborate his lie to the court, which she refused to do. (R.9-25, PageID# 6413). Talman was also panicking because the prosecutor had complained it was all hearsay. (*Id.).* Dr. McCoy offered to consult with other attorneys regarding the potential hearsay issue. (*Id*.). When she could not reach them, Talman told her that she would not be called to testify, and in fact, she was not. (*Id*. at PageID# 6413-14).

After abandoning the previously-planned mitigation case, on the eve of the penalty phase of Pike's trial, counsel was left with only a few hours to concoct an alternative presentation. No potential witnesses were under subpoena to appear. (R.9-18, PageID# 5752-55). Counsel did not seek a continuance. Talman ultimately called the three witnesses who had been present throughout the trial and were available on short notice: Pike's maternal aunt, father, and mother.

Opening statements began after 9:30 and all testimony in mitigation had been given before 11:45. (R.8-11, PageID# 3035, 3112). Testimony from these three witnesses covers less than sixty pages of

transcript. (R.8-10, PageID# 3049-65 through R.8-11, PageID# 3069-3111). Family members gave an abbreviated overview of Christa's chaotic life. *See infra*. Information was elicited in a haphazard manner with the prosecutor and trial court instructing defense counsel on how to lay a proper foundation. (R.8-10, PageID# 3052-53, 3057-58; R.8-11, PageID# 3081-82). At one point, counsel attempted to elicit testimony about Christa's family history of substance abuse using a chart prepared by Dr. McCoy, but the trial court would not allow it because "[n]one of you are experts as to substance abuse." (R.8-10, PageID# 3058). The prosecutor elicited negative information that these family members had told Dr. McCoy that were contained in the materials that had been turned over to the State just before the penalty phase.

Trial counsel's sentencing phase argument was brief. Attorney Rice never mentioned Christa's borderline personality disorder, history of physical and sexual abuse, abandonment and neglect, or even told the jury that Christa's youth was a statutory mitigating factor. Rather, counsel emphasized the prosecution argument that their client enjoyed the attention this case brought. In opening, the defense had argued that because she enjoyed attention, the defense proposed a life sentence

as a more severe punishment, reasoning to the jury that Christa would receive less attention than if the jury imposed death. (*Id.* at PageID# 3046). Counsel was actually arguing that the jury should inflict what they characterized as the harshest punishment. The jury responded by imposing the harshest punishment under the law. The jury imposed death.

## III. PIKE IS ABLE TO MEET THE STANDARDS FOR THIS COURT TO GRANT CERTIFICATES OF APPEALABILITY.

To obtain a certificate of appealability, a habeas corpus petitioner must make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A petitioner must demonstrate that jurists of reason could disagree with the District Court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473 (2000), *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). The petitioner "need not show that he should prevail on the merits." *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4, (1983). A claim warrants issuance of a certificate of appealability if it presents a "question of some substance," *i.e.*, an issue (1) that is "debatable among

jurists of reason;" (2) "that a court could resolve in a different manner;" (3) that is "adequate to deserve encouragement to proceed further," or (4) that is not "squarely foreclosed by statute, rule or authoritative court decision, or ... [that is not] lacking any factual basis in the record." *Barefoot v. Estelle*, 463 U.S. at 893. n.4, 894; *see also*, *Slack v. McDaniel*, 529 U.S. 473 (2000).

Where the state courts adjudicated the petitioner's claims on the merits, the relevant question is whether the district court's application of 28 U.S.C. § 2254(d) to those claims is debatable by jurists of reason. *Kissner v. Palmer*, 826 F.3d 898, 902 (6th Cir. 2016). Where the District Court denied a claim on procedural grounds "without reaching the prisoner's underlying constitutional claim," a certificate of appealability is proper where

> jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the District Court was correct in its procedural ruling.

*Slack*, 529 U.S. at 478.

The Supreme Court reaffirmed its holdings from *Barefoot* and *Slack* in the decision of *Miller-El v. Cockrell*, 537 U.S. 322, (2003). In *Miller-El*, the Supreme Court reversed the Fifth Circuit Court of

Appeals' denial of a certificate of appealability. *Id.* at 327. The Fifth Circuit had improperly interjected the requirements of 28 U.S.C. § 2254 into the certificate of appealability determination assuming that it was required "to presume the state court findings correct unless [it] determin[ed] that the findings result[ed] in a decision which is unreasonable in light of the evidence presented." *Miller-El v. Cockrell*, 537 U.S at 330. The Supreme Court clarified, however, that "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review." *Id.* at 340.

> The COA determination under § 2253(c) requires an overview of the claims in the habeas petition and a general assessment of their merits. We look to the District Court's application of AEDPA to petitioner's constitutional claims and ask whether that resolution was debatable amongst jurists of reason. This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claim. In fact, the statute forbids it. When a court of appeals sidesteps this process by first deciding the merits of an appeal, and then justifying its denial of a COA based on its adjudication of the actual merits, it is in essence deciding an appeal without jurisdiction.

*Id.* at 336-37. Thus, a COA does not require a showing that the appeal will succeed. *Id.* at 337. Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and

the case has received full consideration, that the petitioner will not prevail. *Id*. at 338.

As shown within, Pike is able to meet the above-cited standards for the grant of a certificate of appealability on each of her habeas claims. In particular, Petitioner Pike will show that jurists of reason could find that her attorneys provided constitutionally ineffective representation. For these reasons, Pike asks this Court to grant her certificates of appealability.

## IV. ARGUMENTS IN SUPPORT OF A CERTIFICATE OF APPEALABILITY

### A. **Jurists of reason could find that the Pike's trial counsel were constitutionally ineffective during the penalty phase of her capital trial. (Claims One and Two, Petition for Writ of Habeas Corpus)**

Even though Christa Pike's trial counsel recognized that the penalty phase was where her case would be won or lost, their mitigation presentation was short, limited in scope, and disjointed. This happened despite the fact that counsel had hired a mitigation specialist who prepared a Social History for Pike containing compelling mitigating evidence. Furthermore, because the prosecution had access to all of the records gathered in the defense investigation, they were able to paint a

very negative image of the defendant. Counsel failed to present important aspects of Pike's background and failed to make any attempt to connect that background to the limited mental health testimony presented in the guilt phase. Because of this, Christa Pike was sentenced to death.

That outcome was far from inevitable. A wealth of mitigating evidence was available that could have been presented to the jury: some that counsel had uncovered in their investigation, as well as other evidence that counsel could have found if their investigation had been adequately thorough. If this evidence had been discovered and presented to the jury by competent counsel, there is a reasonable probability that at least one juror would have voted for a life sentence. The Tennessee's courts' decision to the contrary was unreasonable.

The Tennessee courts correctly recognized that this issue was governed by *Strickland v. Washington*, 466 U.S. 668 (1984), however, the state courts' resolution of this issue was an unreasonable application of *Strickland*. For one thing, in its final analysis the Tennessee Court of Criminal Appeals applied an outcome-determinative test to the prejudice prong that was contrary to *Strickland*. *Pike*, 2011

WL 1544207, at *52. More importantly, the facts found in the state court and relied upon in resolving this issue were unreasonable in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Even though the district court denied relief, reasonable jurists could disagree on that ruling and this Court must find that a Certificate of Appealability is warranted.[5]

**1. Because the state court's decisions on Ineffective Assistance of Counsel were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, the District Court was permitted to conduct a federal evidentiary hearing on this issue.**

[5] In the district court, Petitioner Pike presented this claim of ineffective assistance of counsel in the penalty phase as two separate grounds for relief. (Habeas Petition Ground One, R.19 PageID# 9666-83; Habeas Petition Ground Two, R.19 PageID# 9683-90). This is because the state courts considered her claims under two separate standards: one for ineffectiveness under *Strickland* and one for ineffectiveness due to conflict of interest under *Cuyler v. Sullivan*, 446 U.S. 335 (1980). *Pike*, 2011 WL 1544207, at *45-46, *44, *46. However, this Court has held that in habeas proceedings, the *Cuyler* standard only applies where the conflict of interest involves concurrent representation of multiple defendants. *Stewart v. Wolfenbarger*, 468 F.3d 338, 351 (6th Cir. 2006). Because this Court will consider all aspects of ineffectiveness under the *Strickland* standard, Petitioner Pike has combined the claims for purposes of this appeal. Contrary to the holding in *Stewart*, Petitioner Pike has argued that the *Cuyler* standard should apply in other instances of conflict of interest.

The district court held an evidentiary hearing on Pike's claims that trial counsel labored under a conflict of interest that affected critical decisions they made regarding the presentation of her case. (Memorandum and Order, R.58, PageID# 10765). However, the court ultimately determined that it would not consider the evidence presented at that hearing and denied relief. (Memorandum Opinion, R.93, PageID# 13315).

Reasonable jurist could disagree with the district court's decision to exclude evidence from hear hearing when determining the merits of Pike's claim. *Pinholster v. Cullen*, 563 U.S. 170 (2011), did not limit the district court's ability to hold a hearing in this case. The *Pinholster* Court held simply that any analysis under (d)(1) is limited to the evidence that was before the state court. *Pinholster*'s holding was expressly limited to (d)(1): "We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 181. Here, the state court factual findings are unreasonable in light of the state court record as a whole. 28 U.S.C. § 2254(d)(2). In making that argument, Pike has relied exclusively on evidence contained in the state court record.

Because Pike demonstrated that the state court factual determinations were based on an unreasonable determination of the facts[6], 28 U.S.C. § 2254(d)(2) is satisfied and the district court should have reviewed the claim de novo, including the facts established at the evidentiary hearing. *Brumfield v. Cain*, 135 S.Ct. 2269 (2015). When one of the criteria under §2254(d) is met there is no bar to re-litigation of the claim and the Court engages in plenary review unencumbered by AEDPA deference. *Harrington v. Richter*, 562 U.S. 86, 98, 131 S.Ct. 770, 784, (2011); *Panetti v. Quarterman*, 551 U.S. 930, 947 (2007); *Rice v. White*, 660 F.3d 242, 251-52 (6th Cir. 2011); *Thomspon v. Bell*, 580 F.3d 423, 436-37 (6th Cir. 2009).

**2. In order to assess the reasonableness of the state court's findings of fact, the district Court was required to engage in a close review of the record to determine if the state court factual determinations are reasonable in light of the state court record as a whole.**

The Supreme Court directs habeas courts to look at the record as a whole to determine if factual determinations are "unreasonable." *See*

[6] The facts found by the state court concerning the conflict of interest are not supported by the record and in fact, sometimes directly contradict it. *See* Section A(3), *infra*. The lengthy post-conviction hearing record also shows that she was diligent in developing the state court record to support her claims.

*Cockrell*, 537 U.S. at 340. Although the Federal court must give substantial deference to State court fact-finding, such:

> Deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief. A federal court can disagree with a State court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence.

*Cockrell*, 537 U.S. at 340.

The issue before the district court was much like the issue before the Supreme Court in *Miller-El v. Dretke*, 545 U.S. 231 (2005). In *Dretke*, the Supreme Court considered whether the race-neutral explanations for peremptory strikes advanced by the prosecutor (that had been accepted by the state court) were reasonable in light of the entire state-court record. Credibility was a key issue, as it was in this case.

> Miller-El may obtain relief only by showing the Texas conclusion to be 'an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.' 28 U.S.C. § 2254(d)(2). Thus, we presume the Texas court's factual findings to be sound unless Miller-El rebuts the 'presumption of correctness by clear and convincing evidence.' § 2254(e)(1). The standard is demanding but not insatiable; as we said the last time this case was here, '[d]eference does not by definition preclude relief.'

*Dretke*, 545 U.S. at 240 (citing *Cockrell*, 537 U.S. at 340).

The Court's analysis in *Dretke* is instructive and serves as a model for this Court's analysis. At the outset, the *Dretke* Court noted that the prosecution used peremptory challenges to exclude 91% of the eligible African-American jurors and noted that "'[h]appenstance is unlikely to produce this disparity.'" *Dretke*, 545 U.S. at 241 (quoting *Cockrell*, 537 U.S. at 342). Then, the Court went on to look at the prosecutor's specific reasons for their peremptory strikes and showed why each one was inconsistent with other evidence presented. In examining the record and assessing credibility, the Court explained that "the credibility of reasons given can be measured by 'how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.'" *Id.* at 247 (quoting *Cockrell*, 537 U.S. at 339).

The district court was required to undertake the same examination to determine the credibility of explanations offered by Attorney Talman for why he never called his mitigation expert, Dr. McCoy, to testify during the penalty phase of Christa Pike's trial--even after he turned over her Social History and supporting documentation

to the prosecution. Just as in *Dretke*, the court must consider, at the outset that it would be unlikely for a defense attorney to build his penalty phase strategy around his mitigation expert only to decide at the last minute not to present the findings from her lengthy investigation.

The present case is also similar to *Brumfield v. Cain*, where the state court applied the correct Federal law, but the Supreme Court found that the factual determinations were unreasonable under 2254(d)(2). *Brumfield*, 135 S.Ct. at 2282. Just as in *Dretke*, the Court closely and carefully examined "the . . . underlying factual determinations on which the trial court's decision was premised. . . ." *Id*. at 2276. After finding that those factual conclusions were unreasonable based on evidence in the state court record, the Supreme Court held that "federal habeas courts may 'take new evidence in an evidentiary hearing' [because] § 2254(d) does not bar relief." *Brumfield*, 135 S.Ct. at 2276 (quoting *Pinholster*, 131 S. Ct. at 1401).

As Petitioner argues in the next section, A(3), *infra*, reasonable jurists could conclude in this case that the district court was authorized

to hold an evidentiary hearing and to consider the evidence presented when determining whether to grant habeas relief in this case.

**3. Reasonable jurists could find that trial counsel's last-minute decision to abandon the mitigation case constituted substandard performance and the state courts' conclusion that counsel's performance in the penalty phase was not deficient was unreasonable.**

There can be no dispute that a last-minute change led to a very limited presentation during the penalty phase of Christa Pike's capital trial. Such a limited presentation was not based on any researched, reasoned or legitimate legal strategy on the part of counsel. Rather, in a panicked decision, counsel abandoned plans to present compelling mitigating evidence because he was ignorant of the law and was afraid his lie to the court would be revealed. This happened despite the fact that lead trial attorney, William Talman recognized the seminal importance of the penalty phase presentation: "I don't think there was any question it was a penalty phase case." (R.9-20, PageID# 5982). Because counsel fully anticipated that the case would proceed to the penalty phase and because much investigation had been done in the six months preceding trial, there was no legitimate reason to fail to present

the biggest part of the evidence that had been gathered. Rather, in this case, it constituted ineffective assistance of counsel.

William Talman was appointed lead counsel in Pike's case on May 25, 1995. (R.9-19, PageID# 5915). He had Dr. Diana McCoy appointed to serve as mitigation specialist several months later. (*Id.* at 5935). She conducted a wide-ranging mitigation investigation where she gathered evidence to present in the penalty phase of Christa Pike's capital trial. (R.9-19, PageID# 5935, 5938-39; R.9-24, PageID# 6290-91). Dr. McCoy prepared a "Social History" of Christa Pike in which she summarized her findings and attempted to explain how Christa's unique personal history led to her involvement in the murder of Colleen Slemmer. (R.9-19, PageID# 5938-39). That Social History was supported by medical records and summaries of the interviews that Dr. McCoy conducted with witnesses who had actual knowledge of Christa's history. (R.9-24, PageID# 6291, 6328-30). According to both Dr. McCoy and Talman, she kept Talman informed as to what she was doing and what she had found as she was conducting her investigation. (R.9-24, PageID# 6293; R.9-20, PageID# 6008). According to Dr. McCoy, she was not asked to conduct any psychological testing and the record

demonstrates that she provided no such results or independent opinions. (R.9-24, PageID# 6298-6300).

For the penalty phase, Mr. Talman recalled that, "our plan was to try and have Dr. McCoy bring all this stuff in, you know, about [Pike's] background and tie it in with Dr. Engum's report." (R.9-20, PageID# 5987). Dr. Engum, a clinical psychologist, had conducted testing on Christa Pike and had concluded that she suffered from "Borderline Personality Disorder." (R.8-7, PageID# 2739). This fact was recognized by Dr. McCoy who proposed as one of her themes in mitigation: "Borderline Personality Disorder." (R.9-24, PageID# 6362-64).

On the Friday afternoon immediately after the jury announced its guilty verdict, the trial court called a meeting *in camera* to discuss the parties' plans for the penalty phase. During that conference, defense counsel handed over the entirety of Dr. McCoy's investigation and work product in the form of her Mitigation Materials and Social History to the prosecutor. (R.8-10, PageID# 3030). Prior to this meeting, counsel had not disclosed any report from Dr. McCoy.[7] Immediately after the *in*

[7] *See* Tenn. R. Crim. P. 16(b) Disclosure of Evidence by the Defendant, and Tenn. R. Crim. P. 26.2, Production of Statements of Witnesses.

*camera* meeting, the parties returned to the courtroom where, on the record, the trial court recessed the penalty phase until the following morning to allow the State time to review Dr. McCoy's materials. (R.8-10, PageID# 3031; R.10-7, PageID# 7089).

The record is unclear as to why the Talman turned over these materials or why the trial court might have ordered that he turn them over. The *in camera* proceedings were not transcribed, and on post-conviction, no party to the meeting could recall precisely what transpired there. (R.10-7, PageID# 7087-89). A large part of Dr. McCoy's materials were indisputably work-product since they contained her interviews with prospective witnesses. This would not be discoverable under Tennessee law since they did not constitute "results or reports of physical or mental examinations and of scientific tests or experiments made in connection with the particular case." Tenn. R. Crim. P. 16(b)(1)(B). Dr. McCoy's "Social History" does not offer any expert opinion based on any testing or examination. Indeed, the lack of an opinion seemed to perplex the prosecution and trial court at the time and Mr. Talman was unable to point to a "conclusory report." (R.8-10, PageID# 3033-34):

MR. CRABTREE: Your Honor, in the brief time that we have had to review the three volume report that we were provided, being the report of Dr. McCoy, we have been unable to find a conclusion, or a summary, or an opinion rendered by Dr. McCoy.

And we need to know if there is anything else, any other report, an addendum to this report--

THE COURT: Is there a conclusory report that you know of?

MR. CRABTREE: --something that will show us what, in fact, her opinion is, rather than just this gross material.

THE COURT: I understand.

MR. TALMAN: Your Honor, as I explained in chambers, I had just received this documentation earlier this week myself.

THE COURT: And I might add, it is a three volume document.

MR. TALMAN: Yes, Your Honor. And it is my belief this is everything, but if we, after adjourning Court, I will contact Dr. McCoy and immediately convey to Counsel--

THE COURT: I would appreciate it if you would do that as soon as I have adjourned--
. . .

MR. CRABTREE. . . If Counsel will make a request of Dr. McCoy as to whether or not there is a report that concludes her findings.

THE COURT: I did not see one in my very quick perusal, also.

(R.8-10, PageID# 3033-34).

The preceding colloquy on the record demonstrates that neither of the defense attorneys nor anyone else present knew whether Dr. McCoy's materials contained any expert opinion. In fact, the Social History does not contain such opinion testimony. However, it is clear that Talman turned over these materials because, he planned to call Dr. McCoy as a witness in the mitigation phase.

In the end, Dr. McCoy was not called to testify during the penalty phase presentation that began and ended the next morning. With no witnesses under subpoena for the sentencing phase, Pike's counsel called the members of her family who happened to be present: her mother, father, and aunt. (R.8-10, PageID# 3048-65; R.8-11, PageID# 3069-3111). These witnesses were asked to testify just before the proceedings began, and they were unprepared to testify. (R.9-6, PageID# 4563-64; 4569-70; R.9-7, PageID# 4682-84; R.9-10, PageID# 4961-62; R.9-25, PageID# 6415-16). When these witnesses were cross-examined, the State made use of Dr. McCoy's Mitigation Materials to impeach them and emphasize negative facts contained in Dr. McCoy's materials. The entire defense presentation only lasted two hours and

covers less than 60 pages of transcript. (R.8-10, PageID# 3035, 3042-3065; R.8-11, PageID# 3069-3111).

In closing arguments, defense counsel never mentioned Dr. Engum's diagnosis of borderline personality disorder and the prosecution emphasized negative testimony elicited using Dr. McCoy's materials. (R.8-11, PageID# 3128-33, 3133-35). The jury returned a verdict of death and in affirming this verdict, the Tennessee Supreme Court quoted the worst of the negative aspects contained in Dr. McCoy's materials. *State v. Pike*, 978 S.W.2d 904, 918 (Tenn. 1998).

During State post-conviction proceedings, Talman offered several justifications for changing abandoning the mitigation defense on the eve of the penalty phase and not calling Dr. McCoy: (1) Dr. McCoy could not corroborate Dr. Engum's diagnosis of borderline personality disorder; (2) that Dr. McCoy's testimony would have been "double-edged" with some negative information coming in; (3) Dr. McCoy had previously been in a relationship with General Crabtree, the lead prosecutor in the case; and (4) "General Crabtree showed up that morning with the report covered in 'yellow stickies'" and seemed to be

very prepared to cross-examine Dr. McCoy.[8] *See Pike*, 2011 WL 1544207, at *49 (summarizing Talman's reasons for not calling Dr. McCoy). The state court credited Talman's testimony and accepted these reasons. *Id.* at *52. Reasonable jurists could conclude that this was unreasonable in light of the state court record. 28 U.S.C. § 2254(d)(2).

In analyzing whether the state court's findings were reasonable, this Court must be mindful of the Supreme Court's command that "the credibility of reasons given can be measured by 'how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.'" *Miller-El v. Dretke*, 545 U.S. 231, 247 (2005) (quoting *Miller-El v. Cockrell*, 537 U.S. at 339). Furthermore, this Court must disregard a State court's "*post hoc* rationalization of counsel's conduct" as opposed to "an accurate description of their deliberations prior to sentencing." *Wiggins v. Smith*, 539 U.S. 510, 526-27 (2003). Under these standards, reasonable

[8] As for the fourth justification, the state court concluded that this could not serve as a justification for not calling Dr. McCoy because the decision was made in the evening before counsel could have seen the prosecutor arrive in court with "stickies." Pike, 2011 WL 1544207, at *49.

jurists could find the state court's decision to credit Talman's justifications was objectively unreasonable.

The most important of Talman's justifications, that he called "the final straw," was his testimony that Dr. McCoy refused to corroborate Dr. Engum's diagnosis of Petitioner Pike that she suffered from borderline personality disorder. According to Talman's testimony at the post-conviction hearing, he decided not to call Dr. McCoy right after she delivered this news: "it was just one of these little huddles outside during a break or something, you know–we're going to start this phase, going to put this witness on, going to put you on. To Dr. McCoy, 'I'm going to have you corroborate Dr. Engum's report and go through things.' And she said, 'I can't do that; I didn't conduct an evaluation of Miss Pike.' And that point is when I made the decision." (R.9-20, PageID# 6010).[9]

Talman's rendition of Dr. McCoy's refusal to corroborate Dr. Engum's diagnosis is highly improbable because it is rebutted by other

[9] The post-conviction trial court concluded that the decision not to call Dr. McCoy was made the evening before the penalty phase. (Findings of Fact and Conclusions of Law, R.9-5, PageID# 4473). If that is correct, Mr. Talman's recollection of a "huddle" during a break could not be accurate since they were not in court that evening.

evidence in the record. First of all, the record contains a document written by Dr. McCoy and sent to Talman entitled "Mitigating Themes," where the first theme she suggested presenting was "Borderline Personality Disorder." (R.11-2, PageID# 7340-46). If Dr. McCoy disagreed with Dr. Engum's diagnosis or felt that she could not testify about it since she had not tested Petitioner, then it seems highly unlikely that she would suggest it as the leading theme in mitigation to Talman.

Also, shortly before trial, Dr. McCoy wrote a letter to defense counsel explaining that some of Petitioner Pike's behavior was "exacerbated by her borderline personality condition resulting from her unstable life and failure to bond." (R.11-2, PageID# 7416). Again, this demonstrates that she agreed with the diagnosis and was seeking further evidence to support it. In addition to this documentary evidence, Dr. McCoy testified at post-conviction that she never disagreed with Dr. Engum's diagnosis. (R.10-01, PageID# 6517).

Other factors suggest Talman's testimony was unreliable because it was "improbable" or a *post hoc* rationalization. Both he and Dr. McCoy testified that they worked together extensively on this case and

consulted with each other on many occasions. (R.9-19, PageID# 5937; R.9-24, PageID# 6293). It defies reason to believe that they never discussed the psychological diagnosis that Talman planned to present at both the guilt and penalty phase. Furthermore, if Dr. McCoy had suddenly announced her disagreement just before Talman was to put her on the stand, it is unfathomable that Talman would not ask for a recess to discuss and clarify the situation when the documents she had provided him demonstrated her agreement. The State court noted that "this could easily be explained as a misunderstanding between the two." *Pike*, 2011 WL 1544207, at *52. However, if any such misunderstanding occurred at such a critical juncture in the case, it is implausible that the attorney would not seek to immediately clear it up by discussing it further with his expert witness.

As for Talman's second explanation, that Dr. McCoy's testimony was "double edged," the state court record demonstrates that Talman knew or should have known the content of Dr. McCoy's proposed testimony long before he turned over her Social History to the prosecutor. Both he and Dr. McCoy testified that they collaborated extensively as they prepared for trial. He had a copy of her work

product several days before the close of the guilt phase and was comfortable enough with it to give it to the prosecuting attorneys. At that point, all of the "negative" information was given over.[10] It would hardly seem logical to give the prosecutor "negative" information and then decide not to call the expert witness because the "negative" information had been given over. This decision would certainly not have a "basis in accepted trial strategy." *Cockrell*, 537 U.S. at 339.

As for the third rationale–that Dr. McCoy had briefly dated the prosecutor in this case–the evidence suggests this was more of an afterthought rather than a real basis for the decision. Talman himself said that he "never doubted Dr. McCoy's integrity." (R.9-20, PageID# 6013). If he never questioned her integrity, then why would this factor worry him? Indeed the post-conviction trial court found that his initial reaction upon learning this information was, "so what?" (R.9-5, PageID# 4446 fn.20). If he believed there was some sort of *per se* problem, he never brought the situation to General Crabtree's attention and he never said anything to the trial court. Furthermore, although Talman

[10] And indeed, the prosecutor presented some of the negative information, outside of any mitigating context, while cross-examining Petitioner Pike's family members during their penalty phase testimony.

could not remember exactly when he learned of this relationship, it is certain that he knew before he gave over Dr. McCoy's Social History. According to Dr. McCoy, whose testimony was corroborated by Attorney Herbert Moncier, Dr. McCoy told Talman about the relationship near the beginning of her involvement in the case. (R.9-25, PageID# 6420-21; R.10-2, PageID# 6679). Since Talman "never doubted her integrity," it is implausible that he would suddenly become worried about this previous relationship the day before he meant to put her on the stand, particularly after he had given her work over to the State.

Since none of these explanations provides a reasonable basis for abandoning the mitigation case by not presenting Dr. McCoy's testimony, this Court must consider other explanations contained in the state court record. After refuting the main reasons offered by defense counsel for not calling her to testify, Dr. McCoy testified that Talman called her in a panic just after he turned over her Social History to the prosecution. He told her that the prosecution had "gone ballistic" about the timing of his disclosure. (R.9-25, PageID# 6413). She testified that he told her he had lied to the trial court and prosecutor by saying he had only received the materials himself the prior evening. (*Id.*). Dr.

McCoy had actually given the three volumes of work to Talman four days earlier. (R.9-25, PageID# 6413). She said that Talman had told her that he planned to provide any discoverable materials to the State only at the last possible instant. (R.9-24, PageID# 6346-47). He asked her to corroborate his lie to the court and she refused to do so. (R.9-25, PageID# 6413). Talman was also panicking because the prosecutor had complained it was all hearsay. (*Id.*). Dr. McCoy offered to consult with other attorneys regarding the potential hearsay issue. (*Id.*). When she could not reach them, Talman told her that she would not be called to testify, and in fact, she was not. (*Id.* at 6413-14).

Unlike Talman's explanations, Dr. McCoy's testimony conforms exactly with other evidence in the record. The trial transcript shows that Crabtree was complaining about the length of the materials he had just received. (R.8-10, PageID# 3030, 3033). Talman agreed that Crabtree was "particularly unhappy." (R.9-20, PageID# 6032). Dr. McCoy's recollection of a hearsay objection seems highly probable since her Social History contained no expert opinion that might allow her report and testimony to constitute an exception to the hearsay rule. Indeed, both the judge and the prosecutor were looking for her opinion

in the Social History immediately after receiving it. *See* R.8-10, PageID# 3033. It also explains the timing of the rash decision not to call her which was made that evening *after* Talman had already turned over the Social History, but *before* the penalty phase presentation had begun.

The Tennessee courts found that trial counsel's abandonment of the mitigation defense was not substandard performance because it had been necessitated as an "exigent" last-minute decision. *Pike*, 2011 WL 1544207, at *51. However, a close analysis of the state court record would lead reasonable jurists to find that there was no legitimate reason for counsel to completely change plans at the last minute.

A competent attorney would have avoided any "exigent" circumstances like these. It is incumbent on any attorney to know his case and his evidence. It is substandard performance for counsel to be unaware of the scope of their expert's work. *See Richey v. Bradshaw*, 498 F.3d 344, 362-63 (6th Cir. 2007) ("A lawyer cannot be deemed effective where he hires an expert consultant and then either willfully or negligently keeps himself in the dark about what that expert is doing, and what the basis for the expert's opinion is.") As this Court

pointed out in *Richey*, resolving any misunderstanding was counsel's constitutional responsibility and needed to be worked out well before the eve of the mitigation hearing.

It is also essential for counsel to ask an expert he planned to call as a witness to prepare a report containing an expert opinion in compliance with the Tennessee rules for discovery. Tenn. R. Crim. P. 16(b). The Tennessee discovery obligation mandates that counsel be aware of exactly whom they are going to call as witnesses and what these witnesses are going to say in order to comply.

Finally, in finding crediting Talman's post-hoc explanations, the state court completely ignored his proven record for dishonesty that led to serious ethical charges that were pending at the time of the Pike trial. Talman eventually pleaded guilty to charges from the Board of Professional Responsibility that he had over billed the Indigent Defense Fund for more than $60,000. (R.12-3, PageID# 8471). These charges involved instances where Talman had billed the Fund for more than 24 hours in one day. (R.9-19, PageID# 5911; R.12-3, PageID# 8451). Because of this dishonesty, he received a suspended sentence of a suspension from the practice of law for eleven months and 29 days.

(R.12-3, PageID# 8515, 8487). Nonetheless, at the time he gave his post-conviction testimony, he showed a tendency to minimize the seriousness of his own misconduct: "There was [sic] some questions and ambiguities in that rule." (R.9-21, PageID# 6118). Dr. McCoy testified that Talman was dishonest with the court during Pike's trial and he was intentionally non-compliant with discovery rules.

The State court failed to account for Talman's history of dishonesty. Nor was there any account taken of Talman's own interest in not being found to be an ineffective attorney. The State court unreasonably ignored facts that undermined Talman's credibility and his post-hoc justifications for abandoning the defense.

Furthermore, the Court of Criminal Appeals downplayed the significance of the cloud of ethical and potential criminal charges that were hanging over Talman's head at the time of Pike's trial. That court unreasonably found that "[a]ll of the evidence presented appears to support lead counsel's own testimony that the investigation was concluded and the matter settled prior to his appointment in this case." *Pike*, 2011 WL 1544207, at *47. This finding is simply wrong. The record is unambiguous that the matter was pending before the Board of

Professional Responsibility and that, at the very least, Talman's ability to practice law was in serious jeopardy.[11] Indeed, the very day after Pike's conviction and sentence became final, Talman's law license was suspended. *State v. Pike*, 978 S.W.2d 904 (Tenn. 1998), *rehrg. denied*, Nov. 23, 1998.[12] The State court unreasonably found that the matter was "concluded" even though there is no ambiguity that those charges were hanging over Talman's head during the entire time that he represented Christa Pike in her capital case. The only support for Talman's claim is his own self-serving testimony. The State court's factual conclusion is therefore rebutted by the record. It was only resolved after Pike had been sentenced to death and resulted in a harsh punishment and censure. The fact that punishment for Talman's dishonest billing had yet to be fixed and that he potentially faced losing his ability to exercise his profession could not have been an insignificant worry for him at the time the prosecution was "particularly unhappy"

---

[11] Although Talman testified that the matter of a possible criminal charge was also concluded (R.9-21, PageID# 6123-24), the statute of limitations for such charges had not run and prosecution from his adversary in the Pike case was still technically a possibility.

[12] The Order of Enforcement in *In re: William C. Talman*, No. 98-1037-2-SG, was entered on November 24, 1998. (R.12-3, PageID# 8487).

with him. The State courts' failure to consider this in assessing Talman's credibility was unreasonable.

Moreover, whether the investigation was concluded by the time of Pike's trial misses the point that Talman had a proven history of dishonesty with the courts. Talman's tendency to practice very close to ethical limits was also apparent during Petitioner Pike's trial. Talman presented the testimony of Dr. Bernet as an expert witness during the guilt phase of the trial. (R.8-8, PageID# 2827). Rather than adhere to the rules of discovery and turn over a report of his expert's opinions to the prosecution as required by Tennessee Rule of Criminal Procedure 16, Talman instructed his expert that there was no need to prepare a report. (R.8-9, PageID# 2882). This angered the prosecution and led to numerous disruptions during Dr. Bernet's testimony while the prosecution tried to figure out the basis of Dr. Bernet's opinion. Eventually, this caused the court to admonish Talman for non-compliance with the rules and order that all of Dr. Bernet's notes and materials be turned over to the prosecution for review. (R.8-9, PageID# 2884, 2890-91).

The fact that Talman had already gotten into trouble for disregarding the discovery rules had to affect the decisions he made when he was, once again, confronted by a prosecutor who was angry about when he received the materials of the expert witness he planned to present in the penalty phase in this case. (R.9-20, PageID# 6032). He was also faced with the prosecutor's assessment that all of Dr. McCoy's proposed testimony was hearsay. (R.9-25, PageID# 6413-14). Even if the Tennessee courts discounted Dr. McCoy's testimony that he asked her to lie for him, Talman would still have a motivation to cover up his own incompetent and dishonest handling of Dr. McCoy's role in the mitigation case. The State courts unreasonably failed to consider this strong motivating factor.

The State court also unreasonably discounted Dr. McCoy's testimony where it contradicted Talman's. The record discloses no motivation for her to testify falsely and, contrary to Talman, she had no reputation of ethical problems. (R.10-4, PageID# 6743-44).

The only reasonable conclusion that explains Talman's decision to not call Dr. McCoy after building his case around her, is that he put his own interests ahead of those of his client. The record shows that the

prosecutor was angry about the timing of his disclosure of Dr. McCoy's work, Talman lied about when he received the materials, and the trial court chose to delay the beginning of the penalty phase because of it. (R.8-10, PageID# 3029-35). This gave Talman a reason to ask Dr. McCoy to lie about when she gave him the materials. Also, Dr. McCoy's Social History contained no expert opinion, a fact he knew or should have known since he had worked so closely with her and had ample opportunity to review her work. He also knew or should have known that the rules required an expert report. The prosecutor's threat to exclude it would have been very real and could have seriously undermined or entirely excluded Dr. McCoy's potential testimony. This would have been personally and professionally humiliating for Talman in this highly-publicized case. The anger and threats were also coming from a prosecutor who was well-aware of Talman's ethical and potential legal difficulties. Because these facts are well-supported by the record, the only reasonable, and certainly the most likely, explanation is that Talman abandoned his plan to call Dr. McCoy in order to protect his own professional and personal interests.

Although the state court found that "[t]he record simply fails to offer anything more than supposition that the overbilling issue affected lead counsel's representation of the Petitioner," *Pike*, 2011 WL 1544207, at *47, there is much more than mere supposition and speculation. Talman's reputation had been publicly sullied and he did not yet know the outcome of the pending ethical charges against him. He had been playing fast and loose with the rules of discovery and had incited the anger of the prosecuting attorney. He had turned over the work product of his mitigation expert even though he had never asked her to reach any expert conclusions. He would have to deal with a serious hearsay problem if he followed through with his plans and presented Dr. McCoy as his only mitigation witness. This series of unprofessional errors led to the mitigation defense being abandoned and cannot constitute a reasonable basis for a reasoned strategic decision.

The Court of Criminal Appeals' decision finding defense counsel's abandonment of calling Dr. McCoy, after giving her materials over to the prosecution, to be a competent one is unreasonable because it ignores the Supreme Court's decision in *Wiggins v. Smith*, 539 U.S. 510 (2003). In *Wiggins*, the Court warned reviewing courts to look carefully

at the "record of the actual sentencing proceedings" to determine counsel's decisions were based on "reasoned strategic judgment." *Wiggins*, 539 U.S. at 526. Where the actual sentencing record does not support a finding of a reasoned strategic decision, counsel's attempts to justify this decision "resemble[ ] more a *post hoc* rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing." *Id.* at 526-27. Here the actual record shows that counsel's explanation that he "wanted to limit what came before the jury" is clearly *post hoc* because he'd already given all of McCoy's information to the State. This Court has found that "the relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Cauthern v. Colson*, 736 F.3d 465, 486 (6th Cir. 2013) (quoting *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000)). Defense counsels' rash, last-minute decision to completely abandon their plan for the presentation of mitigation cannot be reasonable because it was based on a lack of knowledge about their own case and a failure to protect their own work product.

Counsel's performance fell below competent standards because counsel had an obligation to plan and prepare for the penalty phase.

*Rompilla v. Beard*, 545 U.S. 374, 380-81 (2005). This planning should have included anticipating discovery disclosure requirements as well as the hearsay rules, so that there would be no last-minute surprises. In addition, counsel had an obligation to place the trial court's order to disclose confidential work product on the record, to object, and to appeal. *See Strickland*, 466 U.S. at 688 ("Counsel has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process."). Finally, counsel had an absolute obligation to know their case and the witnesses who could establish it, under the applicable rules, so that there would not be a last-minute "exigent decision" to change the entire plan that would necessarily leave out crucial mitigating evidence and arguments. All of the problems were caused by counsel's lack of preparation. Christa Pike's attorneys failed in all of these obligations and the state court conclusion that their performance was not deficient is unreasonable.

**4. The Tennessee courts' decision that Pike was not prejudiced by counsel's failure to present the mitigation evidence Dr. McCoy had gathered is unreasonable.**

Reasonable jurists could find that Pike was prejudiced. Because of counsel, abandoned his defense at the last-minute, no witnesses were

under subpoena and counsel had to make do with those people who were available. The witnesses presented were Pike's family members who happened to be present but who were unprepared to testify. These were the witnesses that Talman had earlier hesitated to call because they were "lay witnesses who could not explain the petitioner's behavior." *Pike*, 2011 WL 1544207, at *51. None of them could testify about Pike's diagnosis of borderline personality disorder and no explanation of this disorder or its mitigating value was presented. Dr. Engum was not recalled so there was no penalty phase testimony about Pike's mental health or how her tragic background may have caused or influenced this personality disorder. Many aspects of Christa Pike's history and her character were never presented to the jury. In Talman's own words: "people didn't know the whole side of Christa." (R.9-21, PageID# 6072). Therefore, the state courts' conclusion that "[m]uch of the evidence presented by the petitioner here was presented to the jury in one of the phases of the trial" is completely inaccurate and unreasonable. Where evidence presented in post-conviction is "much more extensive, powerful and corroborated" than what was presented at

trial, a habeas petitioner has shown prejudice. *Goodwin v. Johnson*, 632 F.3d 301, 328 (6th Cir. 2011).

Significant portions of Dr. McCoy's Social History, with context about how events in Pike's background shaped her into the adolescent she became, were never presented to the jury. Testimony from Dr. McCoy in post-conviction, along with the records she collected reveals a part of the mitigation case that could have been presented at trial and shows relevant aspects of Christa Pike's history that the jury never knew.

No testimony was presented at trial that would have shown that Christa's mother was married five times during Christa's childhood and that she had numerous affairs with other men as well as live-in boyfriends during that time. (R.11-3, PageID# 7480, 7482-83, 7485).

While Christa's father testified at trial that he was a "strict disciplinarian," Christa told Dr. McCoy that her father would beat her with a belt. (R.8-11, PageID# 3083; R.11-3, PageID# 7491). This was later confirmed by Dr. Pincus who was able to do a physical examination of Christa and identify the physical scars left by the beatings. (R.9-8, PageID# 4782-83).

The sentencing jury never knew that Christa was shuffled back and forth between her parents to such an extent that she failed school in the third and seventh grades despite the fact that Dr. Engum testified that she was "very intelligent."[13] (R.8-7, PageID# 2738; R.11-3, PageID# 7481, 7483-85, 7508-09). The number of schools she actually attended while moving back and forth is startling. *See* McCoy's Social History, "Educational Data." (R.11-3, PageID# 7508-09). She had to go to summer school to avoid repeating the sixth grade. (*Id.* at PageID# 7508). From the testimony elicited at trial, the jury would not have known that her mother left West Virginia to live in North Carolina after her parents divorced for the second time and her mother had met up with a trucker by CB radio. (*Id.* at PageID# 7483). After this, her parents shuffled Christa back and forth between West Virginia and North Carolina two to three times a year. (*Id.* at PageID# 7490). At one point, her father dropped Christa and her suitcases off on her mother's doorstep and left her even though her mother was not home.

[13] Early school records indicate that Christa did very well on standardized tests, scoring in the top 10% nationwide in academic achievement testing although her actual grades did not reflect her potential. (R.11-3, PageID# 7509).

(R.11-3, PageID# 7485). Each parent would threaten the other by saying they would send Christa to live there. (*Id.*) At this point, both parents were saying that they could not handle her. (*Id.* at PageID# 7509).

Although the jury heard that Christa had threatened one of her mother's live-in boyfriends with a butcher knife, it never knew that the boyfriend in question, Steve Kyaw, pinched Christa's breasts and felt her up while wrestling with her when she was about twelve years old. At one point, he hit her in the face with a belt and she grabbed a butcher knife and began chasing him. Kyaw was arrested. (R.11-3, PageID# 7485). This was the actual story behind the "butcher knife" incident elicited by the prosecution during the trial. Furthermore, the jury never knew that social services became involved with Christa and her mother because of this incident. Far from viewing this incident as the child's fault, social services focused on the unstable environment in which the child was being raised and attempted to intervene. (*Id.* at PageID# 7504). The jury had no way of knowing that her caseworker, Kerry Clement, was willing to testify about her efforts to help Christa that were often hindered by Christa's mother. (*Id.*) This was

potentially powerful mitigation evidence that the State was able to twist into harmful evidence to show Christa's violent nature.

The jury that sentenced her to death never knew that Christa had attempted suicide on at least two occasions, the first time being when she was in the sixth grade and then again in seventh grade. (R.11-3, PageID# 7508; R.9-8, PageID# 4804). This was not a child who was simply "out of control" and "blowing chances" as the prosecution argued to her jury. This was a child who was having serious mental health issues at a very early age and these issues were being systematically ignored by her parents.

The jury never learned that Christa was sexually assaulted and/or raped on at least two occasions. The first incident took place when she was around eleven and then again when she was seventeen. (R.9-8, PageID# 4787; R.12-5, PageID# 8759-70). The problems were compounded because her mother did not believe she had been assaulted. Around the time of the first sexual assault, she made her first suicide attempt. (R.12-2, PageID# 8315). Christa's aunt had speculated that Christa may have been sexually abused by her grandmother's boyfriend because Christa slept between them and later

was seen inappropriately stroking her grandmother's breasts. (R.11-3, PageID# 7481; R.9-7, PageID# 4712-13). She also drew sexually explicit pictures in kindergarten or first grade suggesting early exposure to inappropriate conduct. (R.9-25, PageID# 6452). Christa's jury never knew any of this and only heard evidence to indicate that Christa was promiscuous.

Furthermore, Dr. McCoy documented the fact that Christa's immediate and extended family glorified violence including her mother always telling romantic rivals that she would "whup your ass." (R.11-2, PageID# 7340). Christa's own mother encouraged her to watch graphic horror movies with her. None of this was presented to Christa's jury who were nonetheless told that Christa had taken Colleen Slemmer to the woods to "teach her a lesson." (R.8-9, PageID# 2953, 2955). In addition, Christa, along with her sister and cousin, would visit their grandfather's slaughterhouse to watch animals being butchered and drained of blood. (R.11-3, PageID# 7498). Since she was only eighteen at the time of the crime in this case, that culture of violence would have had a strong influence on her and would have lessened her moral culpability for this crime.

The jury was never told that Christa spent time in a juvenile facility as a teenager and for the first time found some stability. (R.11-3, PageID# 7503; R.9-11, PageID# 5130-33, R.9-12, PageID# 5148). Although she did not like being there, she recognized that the stability was good for her and she sabotaged herself to avoid having to go home. (R.11-3, PageID# 7503; R.9-11, PageID# 5136-37; R.9-12, PageID# 5157). The jury also never heard that staff at the facility grew to like Christa and recognized that she stayed in trouble to avoid being sent home. This same staff noticed that her mother rarely visited. (R.11-3, PageID# 7503; R.9-12, PageID# 5179, 5200). They also knew that her father never visited. (R.9-10, PageID# 4994-95; R.9-12, PageID# 5184). Christa's capital jury was never informed of this.

Despite all of her troubles, Dr. McCoy located a number of people who had been sufficiently impressed with Christa's positive attributes that they would have testified for her at her capital trial. A North Carolina attorney who represented her remembered her as "a sweet, bright, and inquisitive girl" and was willing to testify at her capital trial. (R.12-1, PageID# 8127). He was so struck by her that he went to visit her after she went to training school. (*Id.*). Christa's jury never

heard from other witnesses, such as Peggy Hamlett, Rose Wilson, and Kerry Clement who knew Christa during her later teens and who had much favorable testimony to impart to the jury. (R.11-2, PageID# 7336-37). These witnesses could have described a troubled teen who was starved for attention and who could be very loving, loyal and hardworking. Talman conceded on post-conviction that he should have called the majority of these individuals. (R.9-20, PageID# 6003-05). Yet, defense counsel had issued no subpoenas to any these potential witnesses so none of them were available to testify. (*Id.* at 6005). In fact, Christa's jury heard almost nothing positive or redeeming about her.

The Supreme Court has held that this type of troubled background information constitutes compelling mitigating evidence. *See Wiggins*, 539 U.S. at 535 (compelling mitigating evidence included "alcoholic, absentee mother" along with "sexual molestation and repeated rape."). *Sears v. Upton*, 561 U.S. 945, 948 (2010) (finding mitigating evidence in verbal and physical parental abuse, sexual abuse, inappropriate parental discipline, and behavioral disorders).

Such evidence "might well have influenced the jury's appraisal of [Christa's] moral culpability." *Williams v. Taylor*, 529 U.S. at 398.

The fact that Dr. McCoy's materials also contained some negative information cannot be used to show a lack of prejudice. Some of this evidence came out anyway through the prosecution's cross-examination. Furthermore, the Tennessee courts' decision is unreasonable because it ignores Supreme Court rulings that hold "[c]ompetent counsel should have been able to turn some of the adverse evidence into a positive." *Sears*, 561 U.S. at 951. *See also Williams v. Taylor*, 529 U.S. at 396 (Finding prejudice for failure to present mitigation despite the fact that "[o]f course, not all of the additional evidence was favorable to Williams.") Much of Christa's negative behavior could have been shown to be the result of her chaotic and abusive background. As the Supreme Court explained in *Sears*, "[t]his evidence might not have made Sears any more likable to the jury, but it might well have helped the jury understand Sears and his horrendous acts." *Id.* Given the facts of the crime in the present case, the lack of a thorough mitigation presentation was much more prejudicial than some negative facts that were in Dr. McCoy's Social History.

Dr. McCoy's unpresented Social History provided impressive mitigating evidence. As shown by Dr. McCoy's "Mitigating Themes," a number of compelling themes could have explained the origins of Dr. Engum's diagnosis of borderline personality disorder, through such themes as Christa's poor role models and their lack of consistent, stable parenting. Her violence and anger also had origins in her own violent, abusive and chaotic upbringing that caused her to be so self-destructive. At age eighteen, even though she was technically an adult, this upbringing still exercised a profound influence on her, particularly given her parents' failure to seek and follow through proper treatment for her. Dr. McCoy's materials also recommended calling witnesses who would speak positively about Christa, something that is completely missing from the testimony presented to the jury. *See Williams*, 529 U.S. at 416 (finding prejudicial the omission of "friends, neighbors and family of [Williams] who would have testified that he had some redeeming qualities").

"This is not a case in which the [evidence not presented] 'would barely have altered the sentencing profile presented to [the sentencer].'" *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (quoting *Strickland*, 466

U.S. at 700). Just as in *Porter*, Christa Pike's jury "heard almost nothing that would humanize [her] or allow them to accurately gauge [her] moral culpability." *Porter*, 558 U.S. at 41. Christa's jury heard many negative things about her, but got almost nothing positive. And, there was no cogent explanation for the negative.

The case that could have been presented would have completely altered Christa Pike's sentencing profile. The Tennessee courts' finding that much of the evidence from Dr. McCoy's materials was cumulative to the evidence that was actually presented is demonstrably false. There is a reasonable probability that a competent mitigation presentation would have resulted in a different outcome in this case. *Strickland*, 466 U.S. at 694. Jurists of reason could find the Tennessee court's decision denying relief unreasonable because the record demonstrates prejudice.

**5. Counsel were ineffective due their failure to discover compelling mitigating evidence.**

Even though Dr. McCoy's investigation had uncovered compelling mitigating evidence, so much more was available. Christa Pike's trial counsel were constitutionally ineffective for their failure to investigate, discover and present evidence of Pike's organic brain damage and its

effects along with evidence that she suffers from bipolar disorder and post-traumatic stress disorder (PTSD). Trial counsel also failed to interview many witnesses from Christa's background, including witnesses who could have provided mitigating evidence of her positive traits as well as fellow participants in the Job Corps who could have testified to its dangerous and violent atmosphere. Counsel's failure and the resulting prejudice constitute ineffective assistance of counsel in violation of the Sixth, Eighth and Fourteenth Amendments. The Tennessee courts' conclusion to the contrary is an unreasonable application of clearly established federal constitutional law.

#### *a) Counsel failed to uncover and present evidence that Christa Pike suffers from organic brain damage.*

Although trial counsel retained a psychologist to examine Christa, numerous red flags pointed to the distinct possibility that she suffered from organic brain damage. When Christa was fourteen months old, she was admitted to Appalachian Regional Hospital after being evaluated in the emergency room for two seizures she had at home. During this hospital admission, an EEG was performed which showed abnormality and the clinical diagnosis was: "seizure disorder." (R.12-5,

PageID# 8786). The abnormality and the diagnosis provided ample evidence to suggest the need for a neurological examination by a medical physician to competent counsel. (R.10-4, PageID# 6774). Furthermore, the fact that she had survived a traumatic car accident where she went through the windshield also suggested the possibility of brain damage. (*Id.* at PageID# 6787). Finally, Dr. McCoy had documented Christa's extensive abuse of inhalants. (R.11-3, PageID# 7502, 7539; R.11-5, PageID# 7855; R.12-1, PageID# 8140). Counsel should have been aware of all of these facts that pointed to neurological damage. Yet counsel failed to seek a medical opinion.

Defense attorneys were alerted to other red flags of a medical mental illness and about the possibility of brain damage in the form of information obtained from prospective lay witnesses. Ms. Pike's maternal aunt told Dr. McCoy that Christa's mother, Carissa Hansen, was an alcoholic for much of her life. (R.11-5, PageID# 7879). Christa's father substantiated this information and further said that he could not recall Christa's mother ever abstaining from alcohol during pregnancy. (*Id*. at PageID# 7885). This was sufficient information to suggest that Christa had been exposed to alcohol *in-utero*, and that she may have

suffered some resulting neurological impairment. Ms. Ross testified at trial that Christa was born prematurely (R.8-10, PageID# 3050) which would also suggest the possibility of neurological issues.

There was a body of evidence which readily suggested brain damage, yet the defense failed to conduct an adequate neurological investigation and thus, failed to discover Christa's neurological disabilities, namely, an abnormality in the brain that impairs Christa's impulse control. This failure of further investigation despite many indications of its necessity amounted to deficient performance. *See Rompilla*, 545 U.S. at 389-90 (failure to look at obvious source for information is not excused by the fact that counsel investigated other possible sources).

Dr. Engum's testing did not uncover this brain damage. However, as Dr. Pincus testified in post-conviction, brain damage, particularly the heterotopia afflicting Ms. Pike, does not show up on neuropsychological testing. (R.9-8, PageID# 4779-80). This is because this damage is physiological in nature. (*Id.* at PageID# 4780). Dr. Pincus thus agreed that no brain damage was discovered through Dr. Engum's testing, but he offered an important qualifier: none could have been discovered by

using limited neuropsychological testing. (R.9-8, PageID# 4778, 4811-17). Because Dr. Engum was not an expert in neurology and could not perform the appropriate testing, he had no way of knowing for certain whether brain damage was present. At most, Dr. Pincus explained, Dr. Engum could have stated that he found no brain damage, but in going further to say none existed, he overstated his findings. (*Id.* at PageID# 4798, 4811-17).

Of course, Petitioner does not contend that defense counsel should be held to a standard of neurological knowledge on par with Dr. Pincus. However, counsel should have seen: (1) that the available evidence suggested physiological damage, and (2) that Dr. Engum was not a medical doctor and might not identify neurological damage. *See State v. Savage*, 577 A.2d 455, 465 (N.J. 1990) (citation omitted) (death penalty defense requires "an expertise regarding special considerations present in capital cases").

These standards represent the minimum level of knowledge for competent counsel in a capital case. Seizures, irregular EEG's, traumatic head injury, and prenatal alcohol ingestion--there can be no question that these things signal problems with the physical brain. As

for the expertise of psychologists, a reasonably competent defense attorney, particularly in a capital case where issues of mental illness are abundant, is required to know the limitations of a psychologist, who is not a medical doctor. Competent counsel would have known that different areas of expertise are needed to make a definitive conclusion about neurological disorders where so much evidence has indicated its presence. As Dr. Pincus noted, you cannot rely on one set of testing to find brain damage, because any one test showing an abnormality is definitive that the abnormality exists. (R.9-8, PageID# 4753-54).

Defense counsel were unreasonable in relying solely on Dr. Engum's opinion because Dr. Engum provided no explanation for the myriad indications of brain damage. After Dr. Engum stated that there was no brain damage, counsel were in the same position as before, with a variety of indications that something was wrong with Christa, but with no overarching theory to explain them. It was unreasonable for counsel to abandon the investigation at this stage and leave an obvious mystery unsolved. Minimal diligence required an opinion from a medical professional with appropriate expertise.

The Court of Criminal Appeals' opinion on this issue is unreasonable for the same reasons. That court found "no deficiency in counsel for not instructing the defense experts in how to do their jobs in areas to which they are supposed to be experts or for not having questioned their opinions." *Pike*, 2011 WL 1544207, at *54 (quoting the post-conviction court). It was not a question of instructing experts in doing their job, but rather, in identifying and selecting the proper expert. The Court of Criminal Appeals' conclusion ignores the fact that Dr. Engum's opinion left so many critical questions about Christa unanswered. Counsel had a duty to seek out the answers to these questions. Where so much evidence pointed to the possibility of neurological damage, jurists of reason could find that her counsel had a duty to explore more than one hypothesis to explain it.

The foregoing is particularly true in a case where, by counsel's own admission, the critical phase of the trial was the penalty phase. (R.9-20, PageID# 5982). Furthermore, the facts of this case were so bizarre and gruesome that counsel should have known that the jury would need as much information as possible about their client's mental state in order to return a life verdict. Counsel acknowledged as much.

(R.9-19, PageID# 5930). Under these circumstances, counsel has a duty to consider all of the evidence and to get as much information as possible.

Counsel's failure to uncover and present compelling evidence that gave some explanation for the offense in this case prejudiced Pike because frontal lobe damage impairs moral reasoning and impulse control. The Supreme Court has found this mitigating. *See Sears*, 530 U.S. at 949-50. Evidence presented in post-conviction demonstrates that Pike is indeed brain-damaged and that this impairment affected her at the time of the offense. (R.9-8, PageID# 4778-79, 4808-09). The state court never made any factual findings to the contrary because its decision denying relief relied on its finding that counsels' performance was not deficient. *Pike*, 2011 WL 1544207, at *54. That evidence could have provided the jury with some insight into why the offense happened the way it did. Reasonable jurists could find that it would have carried strong weight in mitigation and that there is a reasonable probability that had it been presented, the verdict would have been different.

#### b) *Counsel failed to discover and present evidence that Christa Pike suffers from bipolar disorder and post-traumatic stress disorder.*

Trial counsel failed to conduct an adequate investigation in that they failed to discover that Pike suffers from bipolar disorder and post-traumatic stress disorder (PTSD). Pike's bipolar disorder and PTSD were readily discoverable at the time of trial. In his post-conviction testimony, Dr. Kenner noted several pieces of information from Pike's social history that immediately suggested bipolar disorder, including: (1) numerous reports from family and friends that Pike exhibited extremely high levels of energy and had trouble sleeping; (2) Pike's suicide attempts; (3) Pike's displays of belief in her own invincibility; and, (4) Pike's EEG at fourteen months, because there is a significant correlation between brain damage and the development of bipolar disorder. (R.10-4, PageID# 6774-79, 6781, 6787-88). During post-conviction, Pike presented still other characteristics suggestive of bipolar disorder, including evidence of rapid and dramatic mood swings, or descriptions of Pike as "out of control," all of which were discoverable at the time of trial. (R.9-11, PageID# 5055-56; 5139).

Dr. Kenner testified that there is a danger of misdiagnosing bipolar individuals as borderline. (R.10-5, PageID# 6953-54). To achieve the correct diagnosis, he stated, a clinician has to acquire longitudinal information about the client, preferably through repeated clinical interviews. (R.10-4, PageID# 6824-26). Dr. Kenner opined that Dr. Engum reached the wrong diagnosis because he had not met with Christa over a sufficient period of time and he lacked her complete social history. (R.10-4, PageID# 6769, 6826).

Regarding his diagnosis of PTSD, Dr. Kenner based his opinion on clinical interviews and Pike's history of abuse, neglect, and trauma. (R.10-5, PageID# 6891-95). He also saw evidence of PTSD in her delusional paranoia, heightened fear of abandonment, and hyper-vigilance in the face of perceived threats. (*Id.* at PageID# 6896, 6898-6900).

As in Dr. Pincus's testimony, this is not a case of defense counsel "instructing the defense experts in how to do their jobs in areas to which they are supposed to be experts or for not questioning their opinions." *Pike*, 2011 WL 1544207, at *54 (quoting post-conviction trial court). Trial counsel had an absolute duty to select the appropriate

experts and to question their opinions to the extent that these opinions gave inadequate explanation to the evidence. Counsel's failure to obtain a correct diagnosis for their client's mental illness constitutes deficient performance and Pike was prejudiced. Her organic brain damage and her illness were both important contributing factors in the offense in this case and they are factors over which she had no control. Dr. Pincus's and Dr. Kenner's diagnosis are well-supported with background evidence and give explanation to Pike's actions. Their mitigating weight would have been significant and in tandem with the other mitigating evidence, would have likely led at least one juror to vote for a life sentence.

#### c) *Counsel failed to contact and present lay witnesses who could have presented mitigating evidence.*

Defense counsel failed to uncover many aspects of Pike's life history as it pertained to her experiences in various institutional facilities, including Child Protective Services, juvenile detention, and Job Corps. This was a significant oversight, considering that Christa had spent part of the last eight years of her life prior to trial, from age ten to eighteen, in various institutional settings. More pointedly,

however, counsel was aware that Christa was rejected by her parents and maternal aunt. The evidence uncovered by Dr. McCoy revealed that the only family member who had cared for Christa, her paternal grandmother, was dead. (*See* R.9-9, PageID# 4907-08; R.9-10, PageID# 4994; R.8-11, PageID# 3070). As a result, it was incumbent upon counsel to seek lay witnesses who could testify to caring for Christa and about her life after she was essentially abandoned by her family. Many of those witnesses who testified in post-conviction, such as: Faye Guy, Carol Goehring, Jamie Robinson, Orlando Powell, Debby Burchfield, Kristina Hargis, Marshall Muse, Andrew Drace and Onas Perry were never contacted prior to trial. However, these same witnesses provided important mitigating testimony during post-conviction. Such proof would have both humanized Christa and helped lead jurors to vote for a life sentence.

These witnesses could have humanized Christa Pike though anecdotes and personal recollections. Significant among their recollections are those of Christa's teacher, Marshall Muse who talked about Christa's writing ability, her imagination, and her sense of humor. R.9-12, PageID# 5206, 5208-09). Onas Perry, who worked at

Swannanoa when Christa was there, could have testified about the late-night talks she and Christa had in which Christa related her bad family situation. (R.9-13, PageID# 5269-71). Debbie Burchfield, another employee at Swannanoa, would have described Christa as "bright" and "very personable." (R.9-12, PageID# 5163). Such positive information was completely lacking at Christa's trial.

Trial counsel also failed to investigate and present information about the Job Corps in Knoxville, the setting for the crime in this case. Christa's teachers and fellow students described it as a dangerous place. (R.9-13, PageID# 5306, 5309-10, 5313, 5339-40). Counsel further failed to investigate and present witnesses who could have testified about the controlling nature of her co-defendant, Tadaryl Shipp. (R.9-15, PageID# 5533, 5535-37, 5545). These witnesses could have shown that Pike had been abused and was being influenced by Mr. Shipp at the time of the offense. Witnesses from the Job Corps program could also have testified about its violent atmosphere where threats of gang violence were constant. (R.9-12, PageID# 5219, 5221). These circumstances greatly influenced Christa's relationship with Tadaryl Shipp and Colleen Slemmer. Furthermore, they affected Christa's

mental state and influenced her thinking at the time of the offense. The following witnesses from the Job Corps were never contacted: Joe Mode, Jacqueline Olebe, Tyrone Comfort, Deandrea Gates, Amanda Robertson, and Jermaine Bishop. Given the obvious relevance of this evidence, in both the guilt and the penalty phases, trial counsel's failure to contact these witnesses constitutes deficient performance. The fact that these witnesses could have contributed significant mitigating evidence demonstrates prejudice.

Although Pike presented this aspect of her ineffectiveness case to the Tennessee courts, the Court of Criminal Appeals opinion never specifically addressed it other than to note that it has been raised. 2011 WL 1544207 at *52. No state court made findings that these law witnesses' testimony was unbelievable or unreliable, or even that it was not mitigating in nature.

There can be no dispute that these lay witnesses were not presented at trial. Nor is there any indication that Dr. McCoy or counsel ever contacted or interviewed them prior to trial. Yet, they provided a significant mitigating evidence that would have contributed towards obtaining a probably life verdict. No one testified as to any of

Christa's positive aspects at trial and very little information was given about her chaotic upbringing. She was prejudiced by its omission.

**6. Conclusion**

Although counsel recognized that this case was one where the penalty phase was most important, counsel failed to present an effective case. This Court must examine the cumulative prejudice from counsel's multiple deficiencies to determine that there is a reasonable probability that but for counsel's ineffectiveness, a different outcome would have occurred. *See Strickland*, 466 U.S. at 694; *Goodman v. Bertrand*, 467 F.3d 1022 (7th Cir. 2006) (unreasonable application of *Strickland* because the state court weighed each error individually when the cumulative effect of the errors required reversal). "To assess [the] probability [of a different outcome under *Strickland*], we consider 'the totality of the available mitigation evidence' . . . 'and reweigh it against the evidence in aggravation.'" *Porter*, 558 U.S. at 41 (quoting *Williams*, 529 U.S. at 397-98 (internal quotation marks omitted)). The state-court record aptly demonstrates that trial counsel failed to adequately prepare their case for a life sentence using the legal expertise the constitution requires them to exercise. Either because of lack of

knowledge, poor planning, or insufficient investigation, they failed to meet minimal constitutional standards. The wealth of available mitigating evidence shows prejudice. Reasonable jurists could find that the Tennessee courts' decision to the contrary represents an unreasonable application of *Strickland* and this Court must issue a Certificate of Appealability on the issue of ineffective assistance of counsel in the penalty phase.

**B. Jurists of reason could find that Pike's trial counsel were constitutionally ineffective during the guilt phase of her capital trial for failing to investigate and present evidence that she did not form the required *mens rea* to be found guilty of first degree murder.**

In Part A(2) of this Application, *supra* at 21-22, Petitioner Pike argued that trial counsel were ineffective for failing to investigate and present available mitigating evidence reducing her moral culpability and which would have lessened the impact of any finding by the jury that she had acted with premeditation. Much of that same evidence could have been presented in the guilt/innocence phase of this case to negate the element of premeditation. It is at least debatable that counsel's failure to investigate and present this evidence constituted ineffective assistance of counsel and undermines confidence in the

reliability of Petitioner's conviction therefore violating her Sixth, Eighth and Fourteenth Amendment rights.

The facts that support this constitutional violation are not in dispute. The state court never made any factual findings that undermine Petitioner's arguments on the claim, only analyzed the legal impact of Petitioner's arguments. *See Pike*, 2011 WL 1544207 at *60-61; *see also* R.23, PageID# 10377-79. It is at least debatable that the district court erred in denying habeas relief on this claim. For this reason, this Court must grant a Certificate of Appealability.

**1. Because counsel failed to effectively challenge the State's case for premeditation by effectively using the necessary experts supported by lay-witness testimony, counsel's performance fell below constitutional standards.**

Trial counsel failed to present an effective case to undermine the State's proof of deliberate and premeditated murder. This was the result of two of the same fundamental errors that plagued Ms. Pike's representation in the penalty phase: failure to make appropriate use of expert witnesses, and failure to discover and use relevant lay witness testimony.

Premeditation was the most contested element during the guilt phase of Pike's trial and was the most difficult element for the State to prove. At the close of the guilt/innocence phase, the trial court charged the jury that in order to find Pike guilty of first degree murder, they must have found each the following elements proven beyond a reasonable doubt: "(1) that the Defendant unlawfully killed the alleged victim; . . . (2) that the Defendant acted intentionally; . . . (3) that the killing was deliberate . . . and (4) that the killing was premeditated." (R.8-10, PageID# 2985). "A deliberate act," the trial court explained, "is one performed with a cool purpose." (R.8-10, PageID# 2985). "Premeditation means that the intent to kill must have been formed prior to the act itself." (*Id.* at 2986). In particular, effective counsel would have been able to show that there was reasonable doubt as to whether Pike acted "with a cool purpose" and whether premeditation had been formed "prior to the act itself."

Counsel's performance in addressing this key issue was constitutionally inadequate. First, defense counsel presented scant expert testimony with regard to Pike's mental state surrounding the

killing in this case. Dr. Engum was the only defense witness to testify to Pike's state of mind surrounding the offense. He testified:

> My opinion is, and it is particularly based on the test results and on a review of her statement, that she basically did not act with deliberation, with premeditation, but instead, acted in a manner consistent with her diagnosis, borderline personality disorder, which meant that she basically went out of control.

(R.8-7, PageID# 2753).

Although Dr. Engum offered a valid opinion, his testimony was insufficiently substantiated. The State was able to exploit this fact on cross-examination by repeatedly pointing out that the factual basis for Dr. Engum's opinion was limited to the statements made by Pike. (R.8-8, PageID# 2764-65, 2777). Because Dr. Engum had no alternative basis for his information, and never asserted that he had reviewed her social history nor how her history of impulsive or explosive behavior was applicable to the issue, he could provide no adequate response. Consequently, the State was able to get him to admit that, if Pike had lied to him, he might be forced to change his opinion, which weakened the impact of his testimony. (*Id*. at PageID# 2777)

The State also pursued a cross-examination strategy that played into the common distrust of jurors for expert witnesses. The State tried

to paint him as an untrustworthy "hired gun." (*Id.* at PageID# 2766-67). Later, the State launched an attack on Dr. Engum's entire field of expertise, implying that Pike suffers from a "phantom" mental illness because the evidence of her disorder is psychological and thus not tangible. (*Id.* at PageID# 2775-76).

Dr. Engum's opinion testimony was effectively discredited. Had counsel adequately prepared their expert by asking him to review and base his testimony on more extensive evidence, he could have responded differently to the State's cross-examination and could have fully supported his opinion. Once counsel had made the decision to rely on expert testimony, it was inexcusable to provide that expert with insufficient information to support his opinions under cross-examination. Counsel's failure constitutes deficient performance.

Counsel made another significant error in their use of Dr. William Bernet during the guilt/innocence phase. Dr. Bernet was called on to testify that Ms. Slemmer's killing was not a satanic ritual, but, rather, was consistent with a phenomenon called "collective aggression." (R.8-9, PageID# 2877-78). The relevance of this testimony was never made clear. (*Id.* at PageID# 2868-76). Dr. Bernet's testimony was prejudicial

because it opened the door to a lengthy discussion of satanism and the various details of Ms. Slemmer's killing that bore satanic overtones, such as the carving of a pentagram in her chest. (R.8-9, PageID# 2897-99). Then, when Talman asked if Dr. Bernet could testify to a reasonable degree of medical certainty as to Ms. Pike's mental state, Dr. Bernet was forced to respond that he could not, "not having interviewed her, and with the limited information I have, I . . . do not have an opinion with that degree of certainty." (*Id*. at PageID# 2880). By asking this question, Talman once again showed that he did not know exactly what role his experts were supposed to take. Due to counsel's ineffectiveness, Dr. Bernet was unable to offer any evidence that could be of assistance in Pike's case even though evidence from a psychiatrist who had examined Pike could have given the jurors a valid basis to find her guilty of a lesser offense than first degree murder.

**2. Evidence presented in post-conviction demonstrates that Petitioner Pike was prejudiced by her counsel's failure to ensure that their experts' opinions were adequately supported and that the proper experts were presented.**

In the end, the jury found Pike guilty of first degree murder even though there is a reasonable probability that this outcome could have

been avoided. Dr. McCoy's Social History was replete with information from witnesses that Christa had extreme mood swings and acted impulsively. Lay witnesses could have been called to show that Christa was incapable of calming down on her own, and needed to be physically restrained while in the midst of a manic rage. (R.9-11, PageID# 5055-56, 5064). This would have demonstrated that once she had become enraged, she was incapable of "cool purpose" that would have indicated that the intent to kill was formed prior to the act itself. If counsel had called lay witnesses or presented evidence from Dr. McCoy's Social History, they could have substantiated Dr. Engum's testimony. He would not have been forced to testify that his opinion was only as good as the defendant's word. The limited presentation with such inadequate foundation on this key issue constituted substandard performance where a thorough presentation could easily have been made.

Furthermore, there is a reasonable probability that the outcome would have been different. *See Strickland*, 466 U.S. at 694. Pike has demonstrated prejudice, particularly with the testimony of Drs. Pincus and Kenner in state post-conviction. According to Dr. Pincus, Christa

suffers from three disabilities that, in combination, correlate strongly with incidents of violence. These disabilities are frontal lobe damage, mental illness, and a history of abuse and neglect. (R.9-8, PageID# 4770-74, 4750-51).

As Dr. Pincus explained, individuals exhibiting all three of the characteristics are significantly impaired in their powers of moral-reasoning and self-control, and are significantly more likely to commit serious acts of violence. (R.9-8, PageID# 4751). Petitioner also showed that the circumstances leading up to the crime in this case were likely to trigger a violent outburst from her. While a student at Job Corps, she was surrounded by violence, which was rampant among the student body. (R.9-12, PageID# 5219; R.9-13, PageID# 5306, 5309-13; *id.*, at PageID# 5339-40). She became fixated and completely dependent on Tadaryl Shipp, a manipulative and violent gang member who played into her insecurities by cheating on her. (R.9-12, PageID# 5221-26; R.10-5, PageID# 6911-13). Among Shipp's lovers was Colleen Slemmer, whom Pike considered a threat to her relationship with Shipp. (*Id.* at PageID# 6912). Slemmer had been having problems with Pike for a long time, and provoked her by coming into her room and standing over

her with a box cutter, calling her names. (R.8-15, PageID# 3377-78; R.9-8, PageID# 4806).

Furthermore, evidence in the post-conviction showed that Pike was raised to believe that the appropriate response to a threat was physical violence. (R.9-7, PageID# 4691-93; R.9-23, PageID# 6233-44). This message was part of her familial culture as a child, and had been reinforced throughout her life. (R.9-8, PageID# 4801). As a result, Pike planned to beat up Slemmer to resolve their conflict. However, because of Pike's disabilities, the attack escalated tragically. Whereas an ordinary person would have recoiled at the injuries she was inflicting, Pike was normalized to the sight of blood and gore from her childhood experiences watching horror movies and playing in her grandfather's slaughterhouse. (R.9-10, PageID# 5033-35; R.9-8, PageID# 4733; R.9-23, PageID# 6253-57).

Furthermore, Pike was only eighteen at the time. An ordinary eighteen- year-old lacks the impulse control, accountability, and solidity of identity of an older adult. For Pike, whose cognitive development was already impeded by brain damage and mental illness, the abilities

to reign in her impulses, regain rationality, and resist peer influence were that much more underdeveloped.

Jurists of reason could find that counsel was constitutionally ineffective for failing to fully investigate and develop evidence that Christa Pike had not formed the required *mens rea* for first degree murder due to mental illness and brain damage. Counsel's failure to do so constituted deficient performance. Because this evidence was compelling, there is a reasonable probability that its presentation would have resulted in a different outcome. *See Strickland*, 466 U.S. at 694-96. This Court must grant a Certificate of Appealability on this issue.

**C. The death sentence in this case violates Christa Pike's rights to a fair jury and due process of law because the trial court dismissed for cause a juror who was qualified to serve and trial counsel were ineffective for failing to object.**

As presented in Grounds One and Five of Pike's habeas petition, defense counsel failed to object when the trial court improperly struck prospective juror Rutherford for cause because he had expressed his reluctance to vote for the death penalty for someone as young as Christa Pike. This constituted ineffective assistance of counsel and resulted in a qualified juror being struck. Because jurists of reason could debate whether these claims were properly denied by the district court, this

Court must grant a Certificate of Appealability on the issue of the dismissal of Juror Rutherford.

After prospective juror Mr. Rutherford had been initially determined to be death-qualified under *Witherspoon* and *Witt*, he told the court that he was having difficulty with the idea of imposing the death penalty due to Christa Pike's youth. This exchange followed:

> Trial Court: Ah, are you telling me that you don't know if you can [give the death penalty], or you think you can, or you think you can't, I, I need you to tell me how you feel.
>
> Mr. Rutherford: I think it would make a big difference with her age whether or not, you know, she would get the death penalty or not.
>
> . . .
>
> General Crabtree: And, frankly, one mitigating factor that the Court could choose to charge you on, that you could consider, is the age factor.
>
> Would that factor in and of itself alone make it difficult, or, in fact, impossible for you to weigh the aggravating circumstances against that?
>
> Mr. Rutherford: I have problems just because of the death penalty.
>
> . . .
>
> General Crabtree: . . . So let's see if we can make it clear–as far as her, the sole factor of her age, that would be something that you could not do?

> Mr. Rutherford: If I felt like, you know, someone that was more mature and stuff like that I wouldn't have a problem with that, but the immaturity is a problem–
>
> . . .
>
> General Crabtree: . . . I understand you to be saying that because of her age that one factor would keep you from returning the death penalty, is that correct?
>
> Mr. Rutherford: I think so.

(R.8-1, PageID# 2048; 2050-52). Thereafter, the court excused Mr. Rutherford for cause. (*Id.* at PageID# 2053).

In affirming the dismissal of prospective juror Rutherford, the Tennessee Court of Criminal Appeals applied federal law unreasonably. Because Mr. Rutherford never said that he would be unable to follow instructions and conscientiously follow the law, he was qualified to serve.

The trial court never instructed Mr. Rutherford that Christa Pike's youth was a statutory mitigating factor. *See* Tenn. Code. Ann. § 39-13-204(j)(7). Nor did anyone inform Mr. Rutherford that he could accord that factor great weight if he found that she was emotionally immature for someone her age. Nor, conversely, was he told that he could accord this factor less weight if he found that she was more mature or if he simply found that her actions were premeditated and

not mitigated by youth. In fact, Mr. Rutherford expressed his belief that it was not age, *per se*, that made him hesitate about the death penalty, but rather the immaturity that generally goes with it: "you know, someone that was more mature and stuff like that I wouldn't have a problem with that, but the immaturity is a problem." (R.8-1, PageID# 2051). Consideration of age and maturity as a mitigating factor was not only permissible in this case, it was required. *See Eddings v. Oklahoma*, 455 U.S. 104, 115-17 (1982). Mr. Rutherford's recognition of this was not a legitimate reason to strike him from jury service.

Mr. Rutherford's views, according great weight to immaturity due to age, are not at all unlike the views expressed by the Supreme Court when it held that the death penalty was unconstitutional for defendants who were under eighteen at the time of their offense. In *Roper v. Simmons*, the Supreme Court held that immaturity due to youth was such a strong factor in mitigation that the death penalty was excluded no matter how strong the aggravation. *Roper v. Simmons*, 543 U.S. 551, 570-71 (2005). Mr. Rutherford's belief, that Ms. Pike's youth would be a strong mitigating factor because she was only eighteen at the time

of the offense, and therefore only barely eligible for the death penalty, is hardly surprising and should not have disqualified him from service.

Mr. Rutherford's excusal violated Ms. Pike's constitutional rights to a fair trial and impartial jury. In *Witherspoon v. Illinois*, 391 U.S. 510, 522-23 (1968), the Supreme Court held that striking a juror who had conscientious scruples against the death penalty but who, nevertheless, could consider it, violated the defendant's right to an impartial jury under the Sixth and Fourteenth Amendments. In *Wainwright v. Witt*, 469 U.S. 412, 424 (1985), the Court clarified the *Witherspoon* standard, proclaiming the critical issue to be "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Later, in *Morgan v. Illinois*, 504 U.S. 719, 731 (1992), the Court held that *Witherspoon* "was in reality a limitation of a State's making unlimited challenges for cause to exclude those jurors who 'might hesitate' to return a verdict imposing death." *Morgan*, 504 U.S. at 731 (citing *Witherspoon*, 391 U.S. at 512-13).

It is at least debatable amongst reasonable jurists that the Tennessee court's decision on this issue represents an unreasonable

application of federal law. While the state court recognized the correct constitutional decisions from the Supreme Court that applied to this issue, it failed to respect the unambiguous directive from the Court to only excuse a juror whose "views would prevent or substantially impair the performance of his duties in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. at 424. Because potential juror Rutherford never said that his views would substantially impair his performance, he should not have been excused. Furthermore, defense counsel had a duty to ensure that federal constitutional law was properly applied here and to object to the erroneous excusal of any juror for cause.

In applying Supreme Court precedent to the facts in this issue, the Tennessee Court of Criminal Appeals erroneously mis-characterized the facts and Mr. Rutherford's statements to the court. He stated that he would not have a problem applying the death penalty to someone who is "more mature." (R.8-1, PageID# 2051). This is the essence of the youth mitigating factor and the basis of the Supreme Court's decision in *Roper*

*v. Simmons*, 543 U.S. 551 (2005).[14] Potential juror Rutherford may have given great weight to the mitigating factor of age, but that would not disqualify him from service under *Witt*. His statements in *voir dire* did not foreclose the possibility of the State proving that despite her chronological age, the defendant was mature or that the aggravating factors in this case were so substantial as to outweigh any consideration of her youth. The State always bears such burdens in death penalty cases.

---

[14] Justice O'Connor's dissent in that case illustrates how Juror Rutherford's voir dire must be understood:

> "[T]he rule decreed by the Court rests, ultimately, on its independent moral judgment that death is a disproportionately severe punishment for any 17-year-old offender. I do not subscribe to this judgment. Adolescents *as a class* are undoubtedly less mature and therefore less culpable for their misconduct, than adults. But the Court has adduced no evidence impeaching the seemingly reasonable conclusion reached by many state legislatures: that at least *some* 17-year-old murderers are sufficiently mature to deserve the death penalty in an appropriate case."

*Roper*, 543 U.S. at 588 (O'Connor, J., dissenting). A reasonable reading of Juror Rutherford's voir dire would certainly put his views in line with those of Justice O'Connor.

For these reasons, it was constitutional error for the trial court to exclude potential juror Rutherford. It was also ineffective assistance of counsel for Petitioner Pike's attorneys to fail to lodge an objection to his removal. Where the court has wrongfully excluded a juror for his views on the death penalty, the death penalty cannot stand. *Witherspoon*, 391 U.S. at 521-22. It is at least debatable that the state court's denial of these claims is an unreasonable application of clearly established law.

**D. Jurists of reason could find that the Eighth Amendment forbids the execution of adolescents suffering from serious mental illness or brain defect.**

Clearly established case law from the United States Supreme Court supports a categorical bar to the execution of older adolescents suffering from serious mental illness or brain defect. A reasonable application of the rationale underpinning *Roper v. Simmons*, 543 U.S. 551 (2005) and *Atkins v. Virginia*, 536 U.S. 304 (2002) compels the finding that the Tennessee state courts should have recognized that a brain-damaged, severely-mentally-ill eighteen year-old, such as Christa Pike, is exempt from capital punishment under the Eighth Amendment to the United States Constitution. This issue deserves to be looked at further such that this Court should grant a Certificate of Appealability.

In *Gregg v. Georgia*, 428 U.S. 153 (1976), the Supreme Court held that a capital punishment statute would be held constitutional so long as it: (1) reflected contemporary public values, as evidenced by objective indicia; (2) satisfied the proportionality requirement that the punishment fit the crime; and (3) entailed no unnecessary infliction of pain. *Id.* at 173. Use of this three-factor analysis has expanded since *Gregg*. Although initially developed to test the facial constitutionality of a given statute, the *Gregg* analysis has since been used to determine whether particular groups merit categorical exception from capital statutes as applied. This practice began with groups defined by their alleged crimes. *Coker v. Georgia*, 433 U.S. 584 (1977) (death penalty for rape of adult woman unconstitutional); *Enmund v. Florida*, 458 U.S. 782 (1982) (death penalty for felony murder unconstitutional where defendant did not kill, attempt to kill, or intend death or use of force). In *Ford v. Wainwright*, the Supreme Court proceeded to analyze groups defined by the characteristics of the members themselves, but only in relation to the effects of those characteristics after the fact of conviction. *Ford v. Wainwright*, 477 U.S. 399 (1986) (death penalty for insane person at time of execution, unconstitutional). In the past 20 years, the

Supreme Court has taken the next logical step, considering the propriety of execution for groups whose defining characteristics suggest a lesser degree of culpability for capital crimes. *See Thompson v. Oklahoma*, 487 U.S. 815 (1988), *overruled by Roper*, 543 U.S. 551; *Penry v. Lynaugh*, 492 U.S. 302 (1989), *overruled by Atkins*, 536 U.S. 304.

In tandem with the expanding use of the *Gregg* analysis, the Supreme Court has arrived at a more precise understanding of each of the three *Gregg* factors. Under the first factor, which calls for an assessment of public values, the courts look to legislation, polls, juror surveys, jury verdicts, positions taken by professional and advocacy organizations, and any other objective data to determine whether public sentiment disfavors execution of the group in question. *See Atkins*, 536 U.S. at 313-17. The second factor--proportionality analysis--entails judicial scrutiny of prevailing scientific and social science literature with an eye towards evidence that the group in question may be physiologically incapable of full culpability. *See Roper*, 543 U.S. at 569-71. Third, and finally, in determining whether execution would result in the unnecessary infliction of pain or suffering, the courts ask whether execution of group members is likely to further either of the purposes of

capital punishment in retribution and deterrence. *See Roper*, 543 U.S. at 571-72.

In arriving at the decision that certain groups must be categorically barred from capital punishment, the Supreme Court explicitly found insufficient the prospect of group members defending against execution on a case-by-case basis. The Court reasoned that existing means of fighting a death sentence--an insanity defense, or presentation of sentencing phase mitigation--provided insufficient protection. In *Roper*, the Court elaborated on the shortcomings of mitigation evidence in the particular circumstances of adolescent defenders who commit violent crimes:

> The differences between juvenile and adult offenders are too marked and well understood to risk allowing a youthful person to receive the death penalty despite insufficient culpability. An unacceptable likelihood exists that the brutality or cold-blooded nature of any particular crime could overpower mitigating arguments based on youth as a matter of course, even where the juvenile offender's objective immaturity, vulnerability, and lack of true depravity should require a sentence less severe than death. In some cases a defendant's youth may even be counted against him.

*Roper*, 543 U.S. at 572-73.

Only categorical exceptions to the death penalty can insure the protection against cruel and unusual punishment for certain groups of less culpable individuals.

Under the factors outlined in *Gregg*, older adolescents who suffer from brain damage or severe mental illness must not be subject to the death penalty. First, adolescents lack sufficient cognitive capacities to achieve the requisite degree of culpability for imposition of the death penalty. For this reason, individuals under the age of eighteen are immune from capital prosecution under federal constitutional law. *Roper*, 543 U.S. at 575. The evidence presented during Petitioner Pike's state-court litigation shows that she, along with other older adolescents, suffers from the same lack of cognitive development. Healthy individuals raised in stable environments may reach cognitive maturity in their early twenties. When the variables of mental illness or environmental abuse and neglect are factored in, cognitive development, and therefore moral reasoning, may take place even later.

In addition, a national consensus is building against the execution of older adolescents as evidenced in the *Roper* decision. At the same time, the diminished culpability of older adolescents may not be

adequately protected through the presentation of mitigating evidence. The reasons that full culpability is lacking are often the very same reasons that youthful offenders are capable of particularly offensive crimes: maturity, defenses to peer pressure, and impulse control are not fully formed. That phenomenon was prominently manifested in Christa's case.

Just as the Supreme Court found youth to justify a categorical exemption from the death penalty in *Roper*, it also found that cognitive impairment justified such an exemption in *Atkins*. Even earlier, the Court had recognized the importance of mental illness and impairment when it held that individuals must be mentally competent at the time of execution in *Ford v. Wainwright*, 477 U.S. 399 (1986). That same reasoning from *Ford* and *Atkins* justifies the exemption of brain damaged individuals, particularly those suffering from severe mental illness.

Banning the execution of mentally-ill, cognitively-impaired adolescents satisfies constitutional requirements of proportionality, and due process. It is also in accord with evolving standards of decency. *See Trop v. Dulles*, 356 U.S. 86, 101 (1958).

The state-court record in this case shows that Christa Pike was indeed a mentally-ill, cognitively-impaired, immature adolescent at the time of the offense and the state courts did not make any contrary factual findings. She was only eighteen years old. Her frontal lobe has been damaged since she was a developing fetus. (R.9-8, PageID# 4770-75). In addition, due to the physical, emotional, and sexual abuse she suffered as a young child, the development of her brain was affected. (R.10-4, PageID# 6830-35). She also suffers from a severe mental illness, bipolar disorder, that is dominated by long periods of hypomania in which she becomes increasingly irritable. (R.9-8, PageID# 4774; R.10-4, Page ID# 6778-79). All of these elements match or surpass the reasons for exempting juveniles and the mentally retarded from the death penalty. She is less able to control her emotions and actions due to mental illness and brain damage. Her frontal lobe, as an eighteen-year-old at the time of the offense, was not just incompletely developed, but was also damaged. The conditions surrounding her case are thus indistinguishable from those of juveniles or the mentally retarded. Under these circumstances, Pike's death

sentence violates the Eighth and Fourteenth Amendments to the United States Constitution.

Pike presented this issue in her post-conviction appeal to the Tennessee Court of Criminal Appeals which addressed this issue on the merits. *Pike*, 2011 WL 1544207, at *44-61. The state-court decision to deny relief was an unreasonable application of clearly established federal law. That court failed to accord due weight to current national trends in death penalty jurisprudence. Since the time of Pike's death sentence, eight states[15] have exempted individuals like Pike from the death penalty by abolishing capital punishment altogether. In addition, the Supreme Court has struck down Florida's application of the *Atkins* decision which it applies only to individuals who score 70 or below on formal IQ tests. *Hall v. Florida*, 134 S.Ct. 1986 (2014). Just as the Supreme Court has found that such a rigid application of *Roper* is unconstitutional, so must this Court find that jurists of reason could debate whether the Tennessee courts' application of recent Eighth

[15] Information obtained from Death Penalty Information Center web page. (http://www.deathpenaltyinfo.org/states-and-without-death-penalty).

Amendment law was also too rigid. This Court must grant a Certificate of Appealability on this issue.

## V. CONCLUSION

Wherefore, Petitioner-Appellant Christa Pike respectfully requests this Court to grant her a Certificate of Appealability (COA) as to each of the issues raised in her Petition for Writ of Habeas Corpus.

Respectfully submitted,

FEDERAL DEFENDER SERVICES
OF EASTERN TENNESSEE, INC.

BY: /s/Stephen A. Ferrell
Stephen A. Ferrell
Asst. Federal Defender
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
(865) 637-7979

**CERTIFICATE OF SERVICE**

I hereby certify that on October 31, 2016, the foregoing *Application for Certificate of Appealability* was filed electronically. Service was made upon Filing Users through the Electronic Filing System. Service was accomplished via regular U.S. Mail on any participating party or counsel who was not served through the Electronic Filing System.

/s/Stephen A. Ferrell
Stephen A. Ferrell